**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** Plaintiff,

v.

**J.B. HUNT TRANSPORTATION, INC., Defendant.**

**No. 97–CV–1553.**

United States District Court, N.D. New York.

Feb. 8, 2001.

Equal Employment Opportunity Commission, Plaintiff, New York District Office, New York, NY (Nora E. Curtin, of counsel), for plaintiff.

Scopelitis Garvin Light & Hanson, Indianapolis, IN (James H. Hanson, Laurie T. Baulig, of counsel), Bond Schoeneck & King, L.L.P., Syracuse, NY (Thomas J. Grooms, of counsel), for defendant.

### MEMORANDUM–DECISION AND ORDER

MORDUE, District Judge.

## I. INTRODUCTION

Presently before the Court are motions for summary judgment by both parties. Plaintiff, the Equal Employment Opportunity Commission ("EEOC"), commenced this action pursuant to the authority granted in Section 107(a) of the Americans with Disabilities Act ("ADA"), codified at 42 U.S.C. Section 12101 *et seq.* EEOC alleges that defendant J.B. Hunt Transport, Inc., ("Hunt"), the nation's largest publicly held truckload motor carrier, violated the ADA by engaging in unlawful employment practices. To wit, EEOC's complaint alleges that Hunt discriminated against a class of applicants to whom Hunt had conditionally offered employment after the company learned these applicants were taking various prescription medications which appeared on a "list" Hunt used to screen truck driver candidates.

Hunt responds that the Drug Review List ("DRL") was developed as a safety-related qualification standard to address concerns arising from side effects associated with drivers' use of prescription drugs while operating tractor trailers on the nation's highways. EEOC contends that the DRL, containing hundreds of disqualifying medications, was not created by a medical doctor nor did Hunt perform individual assessments of applicants' actual risks for or experience with dangerous side effects. Consequently, EEOC contends that when Hunt refused to hire this class of truck driver applicants because of their taking of prescription medications, it discriminated against persons with disabilities or "perceived" disabilities in violation of the ADA.

## II. FACTUAL BACKGROUND

Hunt is a motor carrier of property engaged in the business of providing regulated, for-hire transportation services in interstate, intrastate and international commerce throughout the 48 contiguous United States, the District of Columbia, Canada and Mexico. Hunt maintains a fleet of equipment that includes 8,000 tractors. The company also employs approximately 12,000 employees, including approximately 10,000 over-the-road ("OTR") drivers. Hunt and its drivers are subject to the Federal Motor Carrier Safety Regulations ("FMCSR") promulgated by the U.S. Department of Transportation ("DOT"), which establishes the minimum qualifications for persons who drive commercial motor vehicles and the minimum duties for motor carriers who utilize OTR drivers. According to these regulations, an employer may require or enforce "more stringent requirements relating to safety of operation and employee safety and health." 49 C.F.R. § 390.3(d). Importantly, the regulations provide that "no driver shall operate a commercial mo-

tor vehicle, and a motor carrier shall not require or permit a driver to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle." 49 C.F.R. § 392.3. Insofar as drivers' use of drugs and other substances, DOT regulations state no driver shall be on duty and possess, be under the influence of, or use, any substance set forth in Schedule I [1] of the regulations, any amphetamine, any narcotic drug or derivative thereof or "[a]ny other substance, to a degree which renders the driver incapable of safely operating a motor vehicle." 49 C.F.R. § 392.4. In addition, "[n]o motor carrier shall require or permit a driver to violate" the above-referenced paragraph. *Id.*

According to Hunt, its OTR drivers run irregular routes and are particularly subject to a variety of adverse work-related conditions such as sleep deprivation, irregular work and rest cycles, weather extremes, long driving periods, irregular meals, long layovers, tight delivery schedules, en route delays, night driving, accumulated fatigue, stress and extended periods of loud noise and vibrations. Because

of the irregular routes and schedules associated with Hunt's truckload carrier operation, safety concerns are heightened. As a result, an OTR driver of a commercial motor vehicle for a truckload carrier such as Hunt must be highly skilled, alert, proficient and able to perform his or her driving tasks safely on the public highway. During the relevant time period involved in this case, Hunt was constantly attempting to hire new drivers because of driver turnover and severe driver shortage. The tractor-trailer combinations driven by the OTR drivers have a combined gross vehicle weight rating of 80,000 pounds and pose a tremendous safety risk to the motoring public and the driver in the event that they are not operated safely.

In its motion papers, EEOC alleges that between January 1995 and December 1997, Hunt rejected hundreds of applicants for the position of commercial driver "who were taking a medication or medications deemed disqualifying without conducting an individualized assessment of whether they could perform the job." In some cases, EEOC alleges the applicants were rejected because the drug or drugs they were taking appeared on the DRL.[2] EEOC contends that Hunt via David Whiteside grossly misapplied DOT regulations in developing the DRL since it is only Schedule

---

1. DOT regulations designate hundreds of medications as Schedule I through V depending on type and quantity of drug. *See* 21 C.F.R. §§ 1308.11–15.

2. The DRL is a 37 page document containing 836 medications. It was created between August or September of 1993 and May of 1994 by David Whiteside, Director of Compliance in Hunt's Safety Department. Whiteside has a bachelor's degree from the University of Oklahoma in Business Management. At the time he created the DRL, Whiteside had no medical training nor did he consult with any medical individual in compiling the list. His sole reference source was the 1993 Physician's Desk Reference ("PDR") which he thoroughly read page by page. Specifically, Whiteside intended the DRL to serve three purposes: (a) to identify certain drugs having known side effects that could impede safe driving; (b) to identify specific applicants taking drugs who would require further evaluation by a medical examiner; and importantly,

(c) to show a good faith effort to comply with the FMCSR.

The DRL contains six columns entitled: "Name," "Class," "Comment," "Restriction," "Treats," and "1993 PDR Page Number." The "Name" column contains the name of a medication. The "Class" column indicates whether the medication is in a class of controlled substances. The "Comment" column contains language about the medication gleaned from the Physicians Desk Reference. The "Treats" column contains one or two conditions for which the medicine is most commonly used.

The "Restriction" column reflects an assessment of the level of risk associated with each medication in connection with the duties of a commercial truck driver based on the possible side effects listed in the PDR. The restriction categories on the DRL were: "Rule Out Side Affects" (sic), "Not Permitted," "Unsafe Affects" (sic), "Heart Condition," and "Disqual Cond." If an applicant was on a

I drugs—not Schedule II–V drugs—which commercial drivers are automatically prohibited from using. Indeed, FMCSR provide that use of these medications is authorized if a driver obtains certification from a medical practitioner that use of the medication will not adversely affect his or her ability to drive. *See* 49 C.F.R. § 391.41. As a result of Whiteside's mistaken belief that Schedule II–V prescription medications were prohibited by FMCSR, EEOC alleges that 102 OTR driver applicants were rejected because their medication was ascribed the DRL restriction "Not Permitted." In spite of this restriction, however, EEOC concedes that during the three year period at issue in this case, Hunt did hire some applicants taking medications deemed "Not Permitted" by the DRL—one in 1995 and seven in 1997.

EEOC also avers that Hunt via David Whiteside misapprehended a DOT report filed after the agency conducted a 1987 conference on "Cardiac Disorders and Commercial Drivers." To wit, EEOC alleges that Hunt "summarily" interpreted the report to prohibit drivers use of various heart condition medications. Plaintiff argues that the report does not prohibit use of cardiovascular pharmacologic agents, but, rather emphasizes the importance of "individualized assessment" in evaluating the impact of various medications on commercial drivers. EEOC thus claims Hunt unlawfully rejected thirteen applicants who were taking such medications without conducting any individualized inquiry.[3] It is undisputed that Hunt did hire a number of applicants taking medications for "Heart Conditions"—five in 1995, four in 1996 and four in 1997.

EEOC also contends that other applicants were rejected on the basis of using contraindicating commercial motor vehicle driving," there are some agents—including, clonidine, methyldopa, quanbenz, reserpine, prazosin, guanthidine and amiodarone—"that are particularly likely to compromise mental or cardiovascular capabilities." It was only the use of beta blockers—"not a contraindication in itself"—which required "individual evaluation." There is no indication in the record of whether the thirteen individuals rejected by Hunt because of "Heart Condition" medications were using beta blockers.

In connection with cardiovascular disorders, EEOC also alleges that 44 of the claimants herein were rejected by Hunt based on their use of the anticoagulant, Coumadin or warfarin sodium, the generic version of Coumadin. These medications were listed on the DRL as "Not Permitted." The same 1987 DOT report referenced above states that "[p]atients receiving warfarin sodium are at risk for hemorrhage secondary to trauma and more rarely, spontaneous bleeding. Operation of a commercial vehicle while anticoagulated with warfarin sodium should be prohibited." EEOC argues, however, that in 1996, DOT issued an "official interpretation" of its regulatory position on Coumadin indicating that use of this medication was not automatically disqualifying. It is undisputed that the DRL was compiled over an eight month period between 1993 and 1994 and completed nearly two years prior to issuance of DOT's official interpretation.

---

medication ascribed the restriction, "Rule Out Side Effects," Hunt required the applicant to obtain a release from the prescribing doctor indicating that the applicant was safe to drive a tractor-trailer while using the medication. Whiteside mistakenly believed that DOT regulations prohibited drivers from taking Schedule II–V medications and ascribed them the restriction, "Not Permitted." Whiteside ascribed a medication the restriction, "Unsafe Effects" if the PDR contained cautionary statements about an individual's ability to operate heavy equipment or drive automobiles while taking that medication. In those instances he would indicate in the "Comment" column, "WARNING on driving motor vehicle." Whiteside also ascribed a medication the restriction, "Unsafe Effects" if the PDR indicated it could cause drowsiness, sedation or dizziness. Medications indicating a high incidence of dizziness were classified as "Unsafe Effects" whereas those with a lower incidence of dizziness would receive the restriction, "Rule Out Side Effects." The restriction, "Disqualifying Condition" was used when the medication was used to treat a condition that may be disqualifying under DOT regulations. The restriction, "Heart Condition" was used by Whiteside to classify medications used for heart problems.

3. In fact, the DOT report in question states that although various cardiovascular therapeutic regimens can include a wide variety of pharmacologic agents "without impairments

medications which did not appear on the DRL.[4] In all, EEOC purports to represent 540[5] claimants who Hunt allegedly failed to hire in violation of the ADA.[6] Again, however, although EEOC contends that Hunt's policy of rejecting applicants based on medication restrictions was a "blanket" exclusionary policy, it concedes that Hunt did hire some individuals taking the otherwise disqualifying medications. Indeed, in 1995, Hunt hired two applicants taking drugs listed on the DRL as "Disqualifying Condition" and eleven using medications deemed to have "Unsafe Effects." In each 1996 and 1997, Hunt hired one person taking a "Disqualifying Condition" medication and thirteen using drugs with "Unsafe Effects." Hunt contends that several of the applicants who were not hired based on their medication usage either did not supply medical information and/or the driver certification necessary to complete their application or, despite being asked to do so, did not supply legible copies of a certification.

All applications received by Hunt for the commercial driver position were sent to its Corporate Driver Personnel department in Lowell, Arkansas where applicants' motor vehicle, criminal and prior employment records were screened along with references. After an applicant received a conditional offer of employment for the position of commercial driver, he or she would undergo a medical screening process, including questions regarding any prescription medications taken in the previous five years. The applicant service representatives ("ASRs") responsible for screening truck driver applicants had no medical training and in most cases did not have college degrees. If the applicant had taken or was taking a medication, Hunt employees consulted the Medical Guidelines and DRL.

If an applicant was on a medication ascribed the restriction, "Rule Out Side Effects," he or she would be informed of the necessity to obtain a medical release from a physician in connection with driving a

4. In addition to the DRL, Hunt maintained a policy and practice with regard to all medications prescribed for a psychological condition. An applicant who was on a medication for a psychological condition was not eligible for employment unless he or she ceased taking the medication for at least 30 days prior to employment and completed all related treatment. This policy appeared in written form in Hunt's Medical Guidelines developed by the company's Medical Advisor in 1996. Hunt argues that EEOC should be precluded from litigating the claims of individuals allegedly rejected based on medications which do not appear on the DRL as the complaint merely references claimants who Hunt failed to hire based on a discriminatory list. While conceding that its complaint refers to a "list," EEOC contends that the pleading is "broad enough" to encompass the claims of all applicants who were rejected on the basis of their medication usage without conducting an individualized assessment as required by the ADA. The Court agrees that for all practical purposes, the allegations of the complaint concern only rejection of individuals based on their use of medications appearing on ·the DRL. The Court need not reach the issue of whether these allegations, standing alone and in the absence of a motion to amend the pleading, are sufficient to encompass the claims of claimants rejected for using medications not on the DRL since, as discussed below, there is no evidence that Hunt's rejection of any of the claimants—whether using drugs on the.DRL or not—was violative of the ADA.

5. EEOC concedes that its original claim in support of 546 applicants is reduced by six class members whose names appeared on the list in duplicate.

6. EEOC asserts that 102 claimants were rejected based on medication with the DRL classification "Not Permitted." It alleges that another 311 were using medications ascribed "Unsafe Effects," while 96 were taking drugs appearing in the "Disqualifying Condition" category. Finally, in connection with claimants affected by the DRL, EEOC contends that Hunt rejected 13 people based on medication used to treat "Heart Conditions." EEOC also alleges that 312 claimants were rejected based on their use of medications for treatment of psychological conditions and 119 were taking medications not appearing on the DRL. Because some claimants were taking more than one medication deemed disqualifying, the sum of these categories exceeds the number of claimants.

commercial truck. If, on the other hand, an applicant was on a medication ascribed the restriction, "Not Permitted," "Unsafe Effects," "Disqual Cond" or "Heart Condition," he or she was often told that the medication was not permitted, was disqualifying, or was "not allowed on the truck." Amongst the class of claimants in this action, the six most commonly occurring medications ascribed the restriction, "Unsafe Effects" were Zoloft, Lithium, Cardura, Amtriptyline, Elavil, and Nitroglycerine.

Hunt denies it "summarily dismissed" candidates based on medication usage and insists that prior to rejecting an applicant who took a drug on the DRL, it would attempt to determine: (a) if the individual could work while taking the drug without affecting the safe operation of the commercial motor vehicle; (b) if not, whether he or she could take a different drug that did not have the same potentially dangerous side effects or he or she could stop taking the drug altogether; or (c) if there was another way the individual could drive safely.

Hunt concedes that its Medical Advisor, who had no medical training, would decide whether to send a potential driver's medical information for review by an outside physician. A disputed number of claimants in this case were referred for a medical records review by Craig Cooper, D.O., an outside consultant hired by Hunt. Dr. Cooper's assessment involved a review of an applicant's medical questionnaire and medical records. Dr. Cooper infrequently spoke to applicants and never physically examined them. There were occasions

when he spoke to an applicant's treating physician. Dr. Cooper used the DRL in his assessment of applicants because it gave him an indication of what medicines the company was concerned about.

It is undisputed that Hunt hired some applicants who were taking drugs on the DRL at the time they applied for driving positions between May 1, 1994, and December 31, 1997.[7] Indeed, prior to beginning their employment, each of those hired in spite of DRL medication use provided Hunt with a medication release or other documentation from his or her treating physician or other health care provider certifying that he or she could safely operate a truck while taking the drug and that he or she did not suffer from dangerous side effects. Hunt thus disputes EEOC's allegation that it maintained a policy of "summarily" denying employment to applicants taking certain medications.

John Carnavale, who had applied to Hunt for a commercial truck driver position and was rejected based on his use of Flagyl for Crohn's disease, filed a Charge of Discrimination with EEOC on November 13, 1996. EEOC issued a Letter of Determination on February 11, 1997, finding reasonable cause to believe that Hunt had violated the ADA. EEOC filed the present complaint on October 24, 1997.[8]

## III. DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.

---

7. Hunt maintains that it hired 910 applicants who were taking medications listed on the DRL. EEOC argues that 831 of these applicants were taking medications ascribed the restriction "Rule Out Side Affects." Since EEOC is not pursuing claims on behalf of any claimants who were taking medications classified on the DRL as "Rule Out Side Affects," it avers that Hunt's hiring of these individuals is irrelevant. In any event, EEOC does not dispute that Hunt did hire other applicants who were taking medications ascribed the

restrictions "Not Permitted," "Unsafe Effects," "Disqualifying Condition," and "Heart Condition" along with those applicants taking medications for psychological conditions.

8. As of January 1, 1998, Hunt concedes that it ceased using the DRL in its hiring process, and the responsibility for all medical and drug review was shifted to Hunt's outside physician to be completed in conjunction with the required DOT physical.

R.Civ.P. 56(c). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See id.* The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325, 106 S.Ct. 2548. Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* Fed.R.Civ.P. 56(e).

Although the trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *see Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985), the motion will not be defeated by a non-movant who raises merely "metaphysical doubt" concerning the facts or who only offers conjecture or surmise. *See Delaware & H.R. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Indeed, the nonmoving party's opposition may not rest on mere denials of the moving party's pleading, but "must set forth specific facts showing there is a genuine issue for trial." *See* Fed.R.Civ.P. 56(e). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a) which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *See Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. "It is a gratuitous cruelty to parties and their witnesses to put them through the ordeal of a trial when the outcome is fore-ordained." *See Mason v. Continental Ill. Nat'l Bank*, 704 F.2d 361, 367 (7th Cir. 1983). It is with these considerations in mind that the Court addresses the parties' motions for summary judgment.

## B. *Americans with Disabilities Act*

The ADA prohibits discrimination by covered entities, including private employers, against "qualified" individuals with a disability. Specifically, it provides that no "covered"[9] employer shall "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is identified as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In turn, a "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Accordingly, to fall within this definition one must have an actual disability, a record of a disability, or be regarded as having one.

Subsequent to passage of the ADA, EEOC issued regulations to provide additional guidance regarding the proper interpretation of the term "disability." The regulations define the three elements of disability: (1) "physical or mental impair-

---

9. The term "covered entity" means an employer, employment agency, labor organization, or joint labor-management committee. *See* 42 U.S.C. § 12111(2)

ment," (2) "substantially limits," and (3) "major life activities." 29 C.F.R. §§ 1630.2(h)-(j) (1998). Under the regulations, a "physical impairment" includes "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." *Id.* at § 1630.2(h)(1). The term "substantially limits" means, among other things, "[u]nable to perform a major life activity that the average person in the general population can perform;" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Id.* at § 1630.2(j). Finally, "[m]ajor [l]ife [a]ctivities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* at § 1630.2(i).

### C. *Burden of Proof*

 To state a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate that: 1) he or she suffers from a disability within the meaning of the ADA; 2) that he or she was otherwise qualified to perform his or her job or a job he or she was applying for; and 3) that he or she was not hired for the job or was discharged because of a disability. *Wernick v. Fed. Reserve Bank of New York*, 91 F.3d 379, 383 (2d Cir.1996). In its capacity as the federal agency charged with the responsibility of enforcing the nation's anti-discriminatory employment laws, plaintiff alleges that Hunt maintained

a discriminatory "pattern and practice" in its hiring procedures.[10] EEOC has prosecuted this claim both on behalf of the affected individual class members as well as the public whom it is obligated to protect from employment discrimination. Hunt maintains and EEOC disputes that it is required to show that class members in this case are "qualified" persons with disabilities or perceived as persons with disabilities within the meaning of the ADA. EEOC avers that it is not required to establish that the claimants are "qualified individuals with a disability" at the **liability** phase of a pattern or practice case. Indeed, it cites the following language from the Supreme Court in support of this contention:

> The plaintiff in a pattern-or-practice case is the Government, and its initial burden is to demonstrate that **unlawful discrimination** has been a regular procedure or policy followed by an employer or a group of employers. At the initial "liability" stage of a pattern-or-practice suit the Government is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish that **such a policy** existed.

*Teamsters*, 431 U.S. at 360, 97 S.Ct. 1843 (emphasis added). The Court's use of phrase "such a policy" clearly refers back to the previous sentence in which appears the language "discriminatory policy" which, in turn, refers to the initially described burden of demonstrating "unlawful" discrimination. Surely Congress intended and the Supreme Court inferred in *Teamsters* that in the context of the bifurcated burden of proof in a "pattern or practice" case the government is still obligated to provide *prima facie* evidence of "unlawful" discrimination.[11]

---

**10.** An employer engages in a "pattern or practice" of discrimination when it commits "more than ... mere[ly] ... isolated or accidental or sporadic discriminatory acts." *Int' Bhd. of Teamsters v. United States,* 431 U.S.

324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (internal quotation marks and citations omitted).

**11.** To be sure, a discriminatory policy which is not "unlawful" is not prohibited by the

■ The ADA prohibits employment discrimination only against "qualified" individuals—those with a substantially limiting disability or perceived as having such a disability who are otherwise capable of performing a job either with or without reasonable accommodation. Consequently, to withstand summary judgment, though EEOC need not prove that each and every class member herein was the victim of discrimination prohibited by the ADA—that is, a "qualified" individual with a disability or an individual perceived as having a disability—, it must show that at least some of the purported class members are such persons. Proof of an employment pattern or practice, without proof that such pattern or practice discriminated against "qualified" individuals within the meaning of the ADA is insufficient.

## D. *Disability Status of Class Members*

■ Defendant Hunt argues that plaintiff's claim is fatally flawed because it assumes that persons who are taking prescription medications for various medical conditions are disabled within the meaning of the ADA. The Court agrees. To be sure, each of the present claimants is affected, perhaps even limited, in a physical or psychological manner by a medical condition for which he or she takes medication. However, the existence of such a medical condition or even the necessity of taking medication to correct it does not necessarily render an individual disabled or entitled to raise an ADA claim in the face of an employer's refusal to hire.

The Supreme Court recently said as much in *Sutton* where the Court examined discrimination claims made by severely myopic global airline pilot applicants who were denied employment notwithstanding that they could fully correct their visual impairments with glasses or contact lenses. In determining whether the plaintiffs stated a cause of action under the ADA, the Court held as follows:

> The Act defines a "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities" of an individual. Because the phrase "substantially limits" appears in the Act in the present indicative verb form, we think the language is properly read as requiring that a person be presently—not potentially or hypothetically—substantially limited in order to demonstrate a disability. A "disability" exists only where an impairment "substantially limits" a major life activity, not where it "might," "could," or "would" be substantially limiting if mitigating measures were not taken. A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently "substantially limits" a major life activity. ... [A] person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not "substantially limi[t]" a major life activity.

119 S.Ct. at 2146–47. That is not to say that disability under the ADA should be determined without reference to corrective measures. Indeed, *Sutton* demonstrates that precisely the opposite is true.[12]

ADA. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 490, 119 S.Ct. 2139, 2150, 144 L.Ed.2d 450 (1999) ("By its terms, the ADA allows employers to prefer some physical attributes over others and to establish physical criteria. An employer runs afoul of the ADA when it makes an employment decision based on a physical or mental impairment, real or imagined, that is regarded as substantially limiting a major life activity. Accordingly, an employer is free to decide that physical characteristics or medical conditions that do not rise to the level of an impairment—such as one's height, build or singing voice—are preferable to others, just as it is free to decide that some limiting, but not substantially limiting, impairments make individuals less than ideally suited for a job.").

**12.** The Supreme Court expressly found that in determining whether an individual is disabled, courts and employers must consider negative side effects suffered by an individual resulting from the use of mitigating measures, particularly when those side effects are very severe. *See* 119 S.Ct. at 2147 (citing JOHN-

"Looking at the [ADA] as a whole, it is apparent that if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures—both positive and negative—must be taken into account when judging whether that person is "substantially limited" in a major life activity and thus "disabled" under the Act." *Id.* at 2146.[13] In arguing that "[a] practice that screens out individuals on the basis of medications is a policy that screens out individuals because of their disabilities," EEOC places great emphasis on the foregoing language from *Sutton* in isolation. However, *Sutton* emphatically holds that "[t]he use or nonuse of a corrective device does not determine whether an individual is disabled; that determination depends on whether the limitations an individual with an impairment actually faces are in fact substantially limiting." *Id.* at 2149 (emphasis added).

Review of the complaint in this matter in addition to the original papers filed by plaintiff in support of its motion for summary judgment suggests that EEOC prosecuted this case largely, if not wholly, on the assumption that the various class members are protected by the ADA simply by virtue of taking or having taken medications for what the Court assumes to be a vast number of medical conditions. To

wit, the complaint alleges that Hunt's policy of using the DRL to exclude candidates for the position of truck driver deprived John Carnevale and "similarly situated individuals with disabilities or who are regarded as having disabilities." EEOC argues in its memorandum of law in support of summary judgment that Hunt "maintained a pattern and practice of denying employment to applicants for the position of commercial driver, if applicants were on certain medications, without conducting an individualized assessment of their ability to perform the duties of the position." EEOC avers essentially that since Hunt failed to hire the various claimants because of their use of certain medications, it "regarded" them as disabled, though they were not, in violation of the ADA.

These allegations and arguments, though appealing on their face, are deficient in one key respect. They fail to establish or even allege the nature of the disabilities afflicting any of the claimants or the disabilities they were regarded as having. All that EEOC has demonstrated herein is that each claimant had a medical or physical condition—which in virtually every case is unspecified—which he or she controlled or attempted to control by way of medication. That the claimants might

SON, ANTIPSYCHOTICS: PROS AND CONS OF ANTIPSYCHOTICS, RN (Aug.1997) (noting that antipsychotic drugs can cause a variety of adverse effects, including neuroleptic malignant syndrome and painful seizures); LIVER RISK WARNING ADDED TO PARKINSON'S DRUG, FDA CONSUMER (Mar. 1, 1999) (warning that a drug for treating Parkinson's disease can cause liver damage); CURRY & KULLING, NEWER ANTIEPILEPTIC DRUGS, AMERICAN FAMILY PHYSICIAN (Feb. 1, 1998) (cataloging serious negative side effects of new antiepileptic drugs)). This result is consistent with the "individualized approach of the ADA." *Id.*

**13.** The Court rejected the suggestion by dissenters Justices Stevens and Breyer that viewing individuals in their corrected state will exclude from the definition of "disab[led]" those who use prosthetic limbs or take medicine for epilepsy or high blood pressure. Indeed:

The use of a corrective device does not, by itself, relieve one's disability. **Rather, one has a disability under subsection A if, notwithstanding the use of a corrective device, that individual is substantially limited in a major life activity.** For example, individuals who use prosthetic limbs or wheelchairs may be mobile and capable of functioning in society but still be disabled because of a substantial limitation on their ability to walk or run. The same may be true of individuals who take medicine to lessen the symptoms of an impairment so that they can function but nevertheless remain substantially limited. Alternatively, one whose high blood pressure is "cured" by medication may be regarded as disabled by a covered entity, and thus disabled under subsection C of the definition.
119 S.Ct. at 2149 (emphasis added).

have faced pain, illness or perhaps even death but for use of the various medications does not demonstrate that any claimant was "substantially limited" in a major life activity or perceived as being so by Hunt.[14] In a revealing portion of its brief, EEOC argues that when Hunt used the DRL to screen truck driver applicants, it made employment decisions based on perceived disabilities created by "fears, stereotypes, and generalizations about particular medications or the underlying condition without determining whether the individual himself could perform the duties of the position." However, the ADA does not protect people based merely on their use of medications. Nor is it "a general protection of medically afflicted persons. It protects people who are discriminated against by their employer ... either because they are in fact disabled or because their employer mistakenly believes them to be disabled. If the employer discrimi-

nates against them on account of their being ... ill, even permanently ill, but not disabled, there is no violation." *Christian v. St. Anthony Med. Ctr.*, 117 F.3d 1051, 1053 (7th Cir.1997).

In the present case, EEOC has presented no evidence that any claimant was actually disabled, that is, substantially limited in any recognized major life activity or was perceived as being so limited by Hunt. Indeed, EEOC goes to great lengths to aver that the claimants were not disabled and were or might have been fully capable of performing the job of commercial driver but for Hunt's exclusionary DRL policy. However, the conclusion that EEOC has failed to state a claim that any of the claimants herein are actually disabled under subsection (A) of the ADA's disability definition does not end the Court's inquiry. In fact, EEOC argues that in violation of subsection (C)[15] of the definition of "dis-

14. Indeed, the Supreme Court addressed this very issue in *Sutton* when it stated:

The [EEOC's] directive that persons be judged in their uncorrected or unmitigated state runs directly counter to the individualized inquiry mandated by the ADA. Th[is] ... approach would often require courts and employers to speculate about a person's condition and would, in many cases, force them to make a disability determination based on general information about how an uncorrected impairment usually affects individuals, rather than on the individual's actual condition. For instance, under this view, courts would almost certainly find all diabetics to be disabled, because if they failed to monitor their blood sugar levels and administer insulin, they would almost certainly be substantially limited in one or more major life activities. A diabetic whose illness does not impair his or her daily activities would therefore be considered disabled simply because he or she has diabetes. Thus, the guidelines approach would create a system in which persons often must be treated as members of a group of people with similar impairments, rather than as individuals. This is contrary to both the letter and the spirit of the ADA. 527 U.S. at 483, 119 S.Ct. 2139.

15. Subsection (C) provides that having a disability under the ADA includes "being regarded as having," *see* 42 U.S.C. § 12102(2)(C), "a physical or mental impairment that substan-

tially limits one or more of the major life activities of such individual." *Id.* at § 12102(2)(A). "There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities." *Sutton*, 119 S.Ct. at 2150. "In both cases, it is necessary that a covered entity entertain misperceptions about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Id.* "These misperceptions often "resul[t] from stereotypic assumptions" not truly indicative of ... individual ability." *Id.* (citing 42 U.S.C. § 12101(7); *School Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 284, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) ("By amending the definition of 'handicapped individual' to include not only those who are actually physically impaired, but also those who are regarded as impaired and who, as a result, are substantially limited in a major life .activity, Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment")).

ability" under the ADA, Hunt perceived the claimants as being disabled, presumably from working, because they were not hired.

### E. *"Regarded as" Disabled under the ADA*

In response to a similar argument in *Harrington v. Rice Lake Weighing Systems, Inc.*, 122 F.3d 456 (7th Cir.1997), the Seventh Circuit noted aptly:

> [The plaintiff's] discharge alone does not evince that [defendant] regarded him as disabled. The notion that [defendant] must have fired [plaintiff] because it regarded him as disabled and that it plainly regarded him as disabled because it fired him is attractive but circular—it lacks causal antecedent.

*Id.* at 461. So too, does EEOC's claim herein. EEOC has presented no evidence that Hunt had any specific knowledge of the claimants' impairments or the manner in which any impairment substantially limited a major life activity. All that EEOC has demonstrated is that Hunt learned through its DRL screening process that claimants were taking various medications to combat a wide range of mental, medical and physical conditions. EEOC has not shown that any of these conditions, even if deemed impairments, substantially limited any claimant's ability to engage in a major life activity.

It is undisputed that the claimants in this case had conditions which may or may not have caused physical or mental impairments and for which they were taking various medications. However, in the complaint and its original moving papers, EEOC did not allege that claimants were "regarded as" disabled due to these various impairments because they were "substantially limited" in any of the "major life activities" referenced in 29 C.F.R. § 1630.2(i) including "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, or learning." If any inference is to be extracted from the complaint, it is that EEOC alleged that

claimants were perceived as being disabled due to Hunt's mistaken belief that they were substantially limited in the major life activity of "working." 29 C.F.R. § 1630.2(i). To support this claim, EEOC alleges that Hunt used the DRL to exclude applicants taking various medications based on fears, stereotypes and generalizations. However, EEOC has presented no evidence describing the specific nature of the otherwise conclusory "fears, stereotypes or generalizations" allegedly entertained by Hunt. EEOC also alleges that use of the DRL as a "blanket" exclusionary policy without conducting an individualized assessment of the applicant's ability to perform the job of commercial driver constitutes a "pattern or practice" of discrimination.

In reply, Hunt argues in the first instance that the DRL did not operate as a blanket exclusion policy because many applicants who were taking medications which appeared on the DRL were ultimately hired after providing Hunt with certification from a medical provider that the medications would not interfere with said applicants' ability to operate a commercial vehicle. There is great disagreement between the parties concerning the significance of Hunt having excluded some, but not all, of the claimants taking medications on the DRL. The Court need not struggle with the weight of this issue since it assumes, for the sake of this discussion, the validity of EEOC's position that the exclusion of even a few claimants on the basis of the DRL was unlawful.

Hunt insists that EEOC's argument is deficient since it assumes without alleging, much less proving, that Hunt regarded any of the claimants as being physically or mentally disabled from a major life activity. Indeed, Hunt avers that EEOC's position regarding the failure to conduct individualized assessments presupposes it believed or had knowledge that the claimants suffered from "substantially limiting" physical or mental impairments. Insofar as EEOC's attempt to rely on the infer-

ence that it viewed claimants as being substantially limited in the major life activity of working, Hunt argues in the first instance that working is not a "major life activity," and in the alternative, that its view that claimants were unqualified for one job with one company (commercial driver for Hunt) is insufficient to show Hunt regarded the claimants as disabled from working generally.

### 1. *"Working" as "Major Life Activity"*

Insofar as proving that an ADA plaintiff is "substantially limited" in the major life activity of working,[16] the Act "does not define 'substantially limits,' but 'substantially' suggests 'considerable' or 'specified to a large degree.'" *Sutton*, 119 S.Ct. at 2150 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2280 (1976)). EEOC's regulations interpreting the term "substantially limits" define the term to mean "[u]nable to perform" or "[s]ignificantly restricted." *Id.* at 2150–51 (citing 29 C.F.R. §§ 1630.2(j)(1)(i),(ii)). According to the Supreme Court, "[w]hen the major life activity under consideration is that of working, the statutory phrase "substantially limits" requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Id.* Indeed, the Court noted that the EEOC defines "substantially limited" in the major life activity of working as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.* (quoting 29 C.F.R. § 1630.2(j)(3)(i)).

Recognizing that in order to meet its burden of proof on this issue, it must show that claimants were "regarded as 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities,'" Brief of EEOC in Opposition to Defendant's Motion for Summary Judgment at 20–21 (quoting 29 C.F.R. § 1630.2(j)(3)(i) and citing *Sutton*, 527 U.S. at 491, 119 S.Ct. 2139; *Tubens v. Police Dep't of the City of New York*, 48 F.Supp.2d 412, 417 (S.D.N.Y.1999)), EEOC avers that Hunt regarded all applicants taking drugs on the DRL as substantially limited in their ability to work as truck drivers because the side effects of their medications precluded them from safely operating a commercial vehicle.

This argument sets presumption upon supposition. In the first instance, the complaint does not allege, nor has EEOC presented evidence that Hunt viewed the class of claimants herein as unqualified to operate commercial vehicles in general. Indeed, Hunt avers that quite the opposite is true since it is undisputed that many of the claimants either were or had been working as commercial drivers prior to the time they applied to Hunt.[17] EEOC's refer-

---

**16.** The Court notes the reluctance of the Supreme Court to define "major life activities" to include work, for "it seems to argue in a circle to say that if one is excluded, for instance, by reason of [an impairment, from working with others] ... then that exclusion constitutes an impairment, when the question you're asking is, whether the exclusion itself is by reason of handicap." *Sutton*, 119 S.Ct. at 2151 (citation omitted). The Supreme Court recognized the EEOC's own hesitancy to include "working" equally amongst other identified "major life activities," based on its view of working as a "residual life activity, considered, as a last resort, only '[i]f an individual is not substantially limited with respect

to any other major life activity.'" *Id.* (quoting 29 C.F.R. pt. 1630, App. § 1630.2(j)). However, as noted by the Second Circuit in *Muller v. Costello*, 187 F.3d 298, 312 n. 5 (2d Cir.1999), "until a more definite pronouncement is forthcoming," courts must give deference to the EEOC's current ADA interpretations which includes "working" as a defined "major life activity."

**17.** The very fact that many unsuccessful applicants had been engaged as drivers both before and after applying to Hunt in spite of their medication usage demonstrates the validity of Hunt's averment that the DRL was a safety standard—a higher one apparently

ence to two incidents where Hunt's ASRs told applicants they "[could] not take [a particular] medication and drive" are too vague and general to evince a company-wide view that applicants taking certain prescription drugs were unqualified to operate all commercial vehicles.

Moreover, EEOC does not allege in the complaint or demonstrate herein that Hunt viewed any of the claimants as disabled further from the entire field of truck driving. EEOC has alleged and proven only that Hunt regarded claimants' use of various medications appearing on the DRL as precluding them from holding positions as "OTR" commercial truck drivers for Hunt. Because the position of "OTR" is a single job for a single employer, EEOC's proof does not support the claim that Hunt regarded claimants as having a substantially limiting impairment. *See* 29 C.F.R. § 1630.2(j)(3)(i); see also Sutton, 119 S.Ct. at 2151 ("Indeed, there are a number of other positions utilizing petitioners' skills, such as regional pilot and pilot instructor to name a few, that are available to them. Even under the EEOC's Interpretative Guidance, to which petitioners ask us to defer, "an individual who cannot be a commercial airline pilot because of a minor vision impairment, but who can be a commercial airline co-pilot or a pilot for a courier service", would not be substantially limited in the major life activity of working.") (citation omitted).

EEOC contends with no factual or legal support that because the DRL was compiled by David Whiteside for Hunt based on information he obtained from the PDR regarding medication side effects, Whiteside "envisioned the sudden onset of ex-treme side effects, which would incapacitate the driver of a tractor trailer." From whence, EEOC concludes "those same side effects would be disastrous to anyone in a safety-sensitive job" and Hunt therefore regarded the claimant as "substantially limited in the broad class of safety-sensitive jobs." To wit, "[i]f the claimants had, in fact, sustained the side effects Whiteside feared, they would be precluded from nearly any job that required one to remain conscious, upright and lucid. Therefore, [Hunt] regarded the claimants as precluded from a whole host of employment opportunities." Brief of EEOC in Opposition to Defendant's Motion for Summary Judgment at 21.

The Court disagrees. There is no causal connection between the DRL, which David Whiteside compiled by leafing page by page through the PDR, taking note of the known side effects for various prescription medications, and the claimants in this case. There is no evidence that any claimant actually suffered from any of the side effects listed on the DRL. The only evidence submitted by EEOC demonstrates that Hunt developed the DRL as a means to screen out candidates who were taking medications with **potentially** dangerous side effects as set forth in the PDR which might inhibit their ability to operate a tractor trailer. "Standing alone, the allegation that [Hunt] has a [physical or medical] requirement in place does not establish a claim that [Hunt] regards [claimants] as substantially limited in the major life activity of working." *Sutton*, 119 S.Ct. at 2150. As referenced above, under ADA regulations, an employer may make employment decisions based on physical, al-

than that employed by other commercial trucking operations—that it developed based on its understanding of DOT guidelines to screen potential drivers. Moreover, even if the Court assumed as the Supreme Court did in *Sutton* that a "substantial number of [commercial trucking companies] have similar [medication] requirements," it would still be insufficient to demonstrate that claimants were substantially limited in the major life activity of working. 119 S.Ct. at 2151–52.

"It is not enough to say that if the physical criteria of a single employer were imputed to all similar employers one would be regarded as substantially limited in the major life activity of working only as a result of this imputation. An otherwise valid job requirement, such as a height requirement, does not become invalid simply because it would limit a person's employment opportunities in a substantial way if it were adopted by a substantial number of employers." *Id.* at 2152.

beit non-disabling, characteristics. *See id.* Hunt insists it did so in this case based on its understanding of DOT safety requirements.

EEOC relies heavily on *EEOC v. Texas Bus Lines*, 923 F.Supp. 965 (S.D.Texas 1996) for the proposition that an employer may be deemed to have "regarded" a job applicant as disabled because of "blind reliance" on erroneous interpretation of DOT regulations. EEOC alleges herein that Hunt made "gross errors regarding DOT regulations which resulted in the exclusion of numerous applicants." It is undisputed that DOT regulations did not require Hunt to exclude candidates taking medications designated as Schedule II–V. However, DOT regulations do expressly permit employers to impose "more stringent requirements relating to safety of operation and employee safety and health." 49 C.F.R. § 390.3(d). Thus *Texas Bus Lines* is inapposite since the employer in that case relied on the disqualification decision of a doctor based on that doctor's opinion that the plaintiff's obesity—a condition not covered by DOT regulations—was disqualifying. *See* 923 F.Supp. at 978–79; *see also Furst v. State of New York*, 1999 WL 1021817, *5 (E.D.N.Y.1999) (distinguishing *Texas Bus Lines* by noting defendant in that case had neither established weight restrictions nor listed impaired mobility as disqualifying condition, but merely required ability to perform normal tasks associated with driving motor vehicle; thus when defendant determined that applicant's weight disqualified her from sedentary job of driving bus, reasonable person could readily infer that defendant perceived her condition as disqualifying her from wide range of jobs).

By way of contrast, in this case, Hunt had established medication restrictions for the position of OTR driver based on existing DOT regulations. Thus, proof that Hunt deemed claimants disqualified from the job of OTR driver is "insufficient, without more, to allow a reasonable person to infer that [Hunt] perceived [claimants] to be disqualified from a wide range of jobs." *Furst*, 1999 WL 1021817, at *5. There is no evidence to suggest that the DRL was used by Hunt as anything other than a mechanism to screen applicants according to its own "more stringent" safety criteria. The ADA merely prohibits use of employment qualification standards or other selection criteria which screen out "an individual with a disability or a class of individuals with disabilities unless the standard test, or other selection criteria ... is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6). Indeed, the ADA provides that it "may be a defense to a charge of discrimination" that a qualification standard is job-related and consistent with business necessity. No one could seriously dispute that a policy of screening applicants who will potentially operate vehicles weighing 80,000 pounds for use of medications which may impair his or her ability to drive is "job-related." Furthermore, Hunt argues that the DRL was consistent with business necessity because it was developed and applied to job applicants "across-the-board" after one of its drivers was involved in a fatal multi-vehicle collision raising the company's concerns about the safety of its drivers and the motoring public as well as its potential financial exposure in the event such accidents resulted in property damage, personal injury and environmental contamination.[18]

---

**18.** EEOC argues that Hunt cannot rely on the "business necessity" defense since it was not raised affirmatively in its answer. Furthermore, EEOC avers that in order to sustain the DRL as a business necessity, it must demonstrate that each individual to whom it applied the policy posed a "direct threat" to the health and safety of other individuals in the workplace. Hunt responds by citing *EEOC v.*

*Exxon Corp.*, 203 F.3d 871 (5th Cir.2000) in which the court stated:

> While no court has as yet addressed the question we answer today, several trends in ADA case law indicate that the direct threat test is not deployed where an employer uses a general safety-based qualification standard applicable across-the-board.... Sev-

2. *"Thinking;" "Concentrating;" "Seeing" and "Sleeping" as "Major Life Activities"*

In reply to Hunt's argument that EEOC has failed to prove that it viewed claimants as substantially limited in the major life activity of working, EEOC alleges for the first time in opposition to Hunt's motion for summary judgment that the company also regarded claimants as disabled based on their inability to think, concentrate, see or sleep, all of which are considered "major life activities" pursuant to ADA regulations.[19] In support of this new argument, EEOC asserts that Hunt excluded applicants based on their use of medications with potential side effects such as: confusion, delusions, severe headaches, light-headedness, delirium, mental impairment, decreased alertness, dizziness, blurred vision, delusion, hallucination, night blindness, visual disturbances, abnormal vision, drowsiness, insomnia, somnolence and sedation. From this EEOC concludes that

Hunt regarded the claimants as substantially limited in thinking, concentrating, seeing and sleeping.

Again, however, the Court notes that the record is bereft of any evidence demonstrating that any claimant actually suffered from any of the above-referenced side effects even assuming that Hunt's knowledge of those side effects would constitute its "regarding" of the particular claimant as disabled. EEOC has not shown that Hunt believed any claimant was unable to think, concentrate, see or sleep. The mere fact that Hunt believed claimants' use of various medications might result in any or all of the above-referenced side effects, standing alone, is insufficient to demonstrate Hunt viewed claimants as substantially impaired in any major life activity. In the absence of any proof suggesting that Hunt regarded claimants as disabled from doing anything other than drive one of its trucks based on their use of medications which Hunt con-

eral cases have held that an employee is "not qualified," without discussing direct threat, if the employee cannot meet an established safety requirement for the position.... Because the "otherwise qualified" analysis and the business necessity defense each involves whether the individual can perform the "essential functions" of the job, these courts' approach mirrors the business necessity standard.... We have found nothing in the statutory language, legislative history or case law that persuades that the direct threat provision addresses safety-based qualification standards in cases where an employer has developed a standard applicable to all employees of a given class. We hold that an employer need not proceed under the direct threat provision of § 12113(b) in such cases but rather may defend the standard as a business necessity. The direct threat test applies in cases in which an employer responds to an individual employee's supposed risk that is not addressed by an existing qualification standard.

203 F.3d at 874–75 (citations and internal quotation marks omitted). EEOC avers that *Exxon* was wrongly decided and has yet to be adopted in the Second Circuit.

Dicta in *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 119 S.Ct. 2162, 2170 n. 15, 144 L.Ed.2d 518 (1999) suggests that the Supreme

Court questions the soundness of "impos[ing] a higher burden on employers to justify safety-related qualification standards than other job requirements" and thus might adopt the reasoning of *Exxon*. In any event, while *Kirkingburg* may foreshadow the ultimate answer to the question of whether an employer must demonstrate a "direct threat" in every circumstance where a safety-based qualification standard is applied to a job applicant, the Court need not decide the issue since Hunt need not rely on an affirmative defense in this case to prevail. Shifting of the burden of proof is unnecessarily based on EEOC's failure—in the first instance—to present a *prima facie* case of employment discrimination under the ADA.

19. "Seeing" is covered directly by 29 C.F.R. § 1630.2(i), while "thinking," "concentrating," and "sleeping" fall within the ADA based on courts' interpretation of the statute and its attendant regulations. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 n. 2 (3d Cir.1999) (deeming thinking as "major life activity" covered by ADA); *DeMar v. Car-Freshener Corp.*, 49 F.Supp.2d 84, 91 (S.D.N.Y.1999) (assuming concentration is "major life activity" under ADA); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 642 (2d Cir.1998) (accepting sleeping as "major life activity" contemplated by ADA).

sidered to have potentially dangerous side effects, EEOC's claim that Hunt unlawfully regarded claimants as disabled in violation of the ADA fails as a matter of law.

### F. *"Record of" Disability under the ADA*

A plaintiff is entitled to ADA protection in connection with adverse employment action if that employment action is related to an employer's knowledge that said plaintiff has a "record of" an impairment which substantially limits a major life activity. See 42 U.S.C. §§ 12102(2)(B); 12112(a). Having a "record of" a disability means that one "has a history of, or has been misclassified as having a mental or physical" disability. In the alternative EEOC argues that even if claimants were not "regarded as" disabled, they had a "record of" disabilities thus entitling them to ADA protection.[20] In the same conclusory fashion in which it alleges Hunt "regarded" claimants as disabled, EEOC avers that "[m]any applicants provided their medical histories to ASR's thus establishing records of various impairments."

To prevail on a claim under the "record of" prong, 42 U.S.C. § 12102(2)(B), the EEOC must demonstrate that in rejecting any of the applicants for the position of OTR driver, Hunt relied on a record which not only established that the claimant then had or previously had an impairment, but a record which shows the impairment in question imposed a substantial limitation

on one of his or her major life activities. *See Colwell*, 158 F.3d at 646. EEOC's reliance on the fact that Hunt was made aware, either orally or through release of various claimants' medical records, that some claimants had been diagnosed or hospitalized for impairments such as depression, anxiety disorder, and alcoholism, is insufficient. As noted recently by the Seventh Circuit:

> If [a plaintiff's] condition does not rise to the level of a disability as defined by the [ADA], then she cannot recover even if [the employer] terminated her because of her condition.... Moreover, if [a plaintiff's] condition fails to fall within the definition of impairment set forth in § 12102(2)(A), she cannot assert that [the employer] terminated her because she had a record of that condition.

*Sinkler v. Midwest Property Management*, 209 F.3d 678, 683 (7th Cir.2000) (citing *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 510 n. 7 (7th Cir.1998)) ("What 12102(2)(B) requires is not simply a diagnosis, but a record reflecting the kind of impairment that would impose a substantial limitation on one or more of the plaintiff's major life activities."). Even assuming the truth of EEOC's assertion that Hunt had requisite "knowledge" of any claimant's underlying medical condition based on receipt of information from a claimant via oral interview or receipt of actual medical records, there is no evi-

---

**20.** Defendant makes much of plaintiff's alleged attempt to change its theory of liability in connection with the present motions. The complaint suggests that EEOC's claims are based on Hunt's policy of refusing to hire truck drivers taking prescription medications deprived persons "with disabilities or who are regarded as having disabilities" of equal employment opportunities. According to the complaint, Hunt's "regard[ed]" the claimants as disabled because of the "potential effects" of prescription medication. The Court notes, however, in context, that EEOC's allegations focus more, if not exclusively, on the "regarded as" prong of the ADA. Moreover, it is apparent from review of the original papers filed by EEOC in support of its motion for summary judgment that the essence of

EEOC's claim is Hunt's alleged discrimination against claimants on the basis of "stereotypes and generalizations associated with ... individual[s'] disability rather than on ... individual[s'] actual characteristics." Plaintiff places far more emphasis on the "record of" aspect of disability qualification in response to defendant's motion papers. The Court need not reach the merits of Hunt's argument that EEOC should be precluded from asserting a new ground for liability nor of EEOC's claim that liberal pleading rules allow it to rely on alternate legal theories not stated in the complaint because, even assuming EEOC has properly prosecuted a "record of" disability claim on behalf of claimants, it is legally and factually deficient.

dence that the information or records in question evinced an impairment which imposed a substantial limitation on any of the claimant's major life activities.[21]

EEOC also argues that Hunt must have regarded the group of claimants rejected because they were taking medication ascribed the restriction "Disqualifying Condition" as disabled based on a physical or mental condition which the company believed was prohibited by DOT regulations.[22] Indeed, EEOC avers that since Hunt's expert testified that he was aware of only three automatically disqualifying

conditions pursuant to DOT regulations— diabetes, alcoholism and active epilepsy— these are in fact the only DOT-prohibited conditions and Hunt's rejection of claimants taking "Disqualifying Condition" medication for other conditions was unreasonable and unlawful. This argument fails for two equally compelling reasons. First, with the possible exception of "depression," each of the conditions listed under the DRL heading "Disqual. Cond." is either explicitly or implicitly prohibited by DOT regulations. *See* 49 C.F.R. § 391.41.[23] Thus, Hunt did not "unreason-

---

**21.** For example, EEOC's reliance on Dr. Cooper's conclusion after reviewing John Carnevale's medical records that he would "not be very attentive to his work" does not suggest, much less prove, that Hunt via Dr. Cooper viewed Carnevale as impaired in the major life activity of "concentrating."

**22.** The DRL lists various conditions in the "Treats" column next to those medications ascribed the restriction "Disqualifying Condition" including: Parkinson's disease, epilepsy, serious arrhythmia, alcoholism, diabetes, seizures, migraines, schizophrenia, depression, dementia, severe arthritis, severe hypertension, subarachnoid hemorrhage, artery occlusion, and severe headaches.

**23.** This regulation describes "Physical qualifications for drivers" as follows:

(a) A person shall not drive a commercial motor vehicle unless he/she is physically qualified to do so and, except as provided in § 391.67, has on his/her person the original, or a photographic copy, of a medical examiner's certificate that he/she is physically qualified to drive a commercial motor vehicle. (b) A person is physically qualified to drive a commercial motor vehicle if that person— (1) Has no loss of a foot, a leg, a hand, or an arm, or has been granted a skill performance evaluation certificate pursuant to § 391.49; (2) Has no impairment of: (i) A hand or finger which interferes with prehension or power grasping; or (ii) An arm, foot, or leg which interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle; or any other significant limb defect or limitation which interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle; or has been granted a skill performance evaluation certificate pursuant to § 391.49.

(3) Has no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control; (4) Has no current clinical diagnosis of myocardial infarction, angina pectoris, coronary insufficiency, thrombosis, or any other cardiovascular disease of a variety known to be accompanied by syncope, dyspnea, collapse, or congestive cardiac failure. (5) Has no established medical history or clinical diagnosis of a respiratory dysfunction likely to interfere with his/her ability to control and drive a commercial motor vehicle safely; (6) Has no current clinical diagnosis of high blood pressure likely to interfere with his/her ability to operate a commercial motor vehicle safely; (7) Has no established medical history or clinical diagnosis of rheumatic, arthritic, orthopedic, muscular, neuromuscular, or vascular disease which interferes with his/her ability to control and operate a commercial motor vehicle safely; (8) Has no established medical history or clinical diagnosis of epilepsy or any other condition which is likely to cause loss of consciousness or any loss of ability to control a commercial motor vehicle; (9) Has no mental, nervous, organic, or functional disease or psychiatric disorder likely to interfere with his/her ability to drive a commercial motor vehicle safely; (10) Has distant visual acuity of at least 20/40 (Snellen) in each eye without corrective lenses or visual acuity separately corrected to 20/40 (Snellen) or better with corrective lenses, distant binocular acuity of at least 20/40 (Snellen) in both eyes with or without corrective lenses, field of vision of at least 70 degrees in the horizontal Meridian in each eye, and the ability to recognize the colors of traffic signals and devices showing standard red, green, and amber;

ably" believe OTR driver applicants who were taking medications commonly used to treat these conditions were "disqualified" by DOT regulations.

Furthermore, EEOC's argument that Hunt's rejection of applicants taking "Disqualifying Condition" medications on the DRL was unlawful because Hunt "regarded" these individuals as suffering from disabling conditions is as flawed as those already discussed above for its failure to apprehend the connection, or more precisely, the lack of connection, between the DRL and the claimants in this case. The DRL listed medications, their **potential** side effects, and some conditions which these medications commonly treat. There is no proof, not even a suggestion, that any of the claimants rejected on the basis of taking a medication ascribed the restriction "Disqualifying Condition" actually suffered from any of the conditions referenced on the DRL.

Only one of the 96 claimants in the "Disqualifying Condition" category, John Eury, submitted an affidavit in this case in which he discussed using Prozac because he had "difficulty concentrating in school, little energy and low self-esteem." Nowhere does Mr. Eury state he was depressed, had been diagnosed as depressed or that Hunt had knowledge of his being depressed. EEOC did submit a portion of the deposition testimony of one other claimant in the "Disqualifying Condition" category, Lorne Davison, but in the portion of the transcript provided, Mr. Davison never stated why he was taking the drug Imuran although the DRL states it "Treats" "Severe Arthritis." Even assuming that any of the conditions listed on the DRL alongside medications ascribed the restriction "Disqualifying Condition" would be deemed "disabling" within the meaning of the ADA, the absence of any evidence that claimants actually had the conditions in question is fatal to EEOC's attempt to show claimants are "disabled" and thus entitled to protection from adverse employment action.[24]

## IV. CONCLUSION

In the Court's estimation, the complaint herein is flawed by EEOC's misapprehension of the operation of the ADA. Although the present litigation pre-dates *Sutton* by nearly two years, EEOC's zealous prosecution of these claims, particularly the claim of punitive damages against Hunt, following *Sutton* is troubling. In *Sutton*, the Supreme Court explicitly stated exactly who is and who is not covered by the ADA. In short, if a plaintiff, even a physically or mentally impaired plaintiff, is not disabled within the particular confines of the ADA, he or she is not protected by the statute. EEOC's focus on Hunt's policy of exclud-

(11) First perceives a forced whispered voice in the better ear at not less than 5 feet with or without the use of a hearing aid or, if tested by use of an audiometric device, does not have an average hearing loss in the better ear greater than 40 decibels at 500 Hz, 1,000 Hz, and 2,000 Hz with or without a hearing aid when the audiometric device is calibrated to American National Standard (formerly ASA Standard) Z24.5—1951.

(12)(i) Does not use a controlled substance identified in 21 C.F.R. § 1308.11 Schedule I, an amphetamine, a narcotic, or any other habit-forming drug.

(ii) Exception. A driver may use such a substance or drug, if the substance or drug is prescribed by a licensed medical practitioner who:

(A) Is familiar with the driver's medical history and assigned duties; and

(B) Has advised the driver that the prescribed substance or drug will not adversely affect the driver's ability to safely operate a commercial motor vehicle; and

(13) Has no current clinical diagnosis of alcoholism.

49 C.F.R. § 391.41.

24. Because EEOC has failed to sustain its burden of showing any of the claimants in the class herein are, were, or were regarded as disabled, the Court need not reach the merits of the parties' vigorous disagreement over the significance of each claimant having received a "conditional" offer of employment from Hunt and whether such offers rendered the claimants "otherwise qualified" for employment under the ADA.

ing candidates taking certain medications from driving its trucks, even assuming the policy is ostensibly unfair because some individuals may never experience dangerous side effects from medication usage, without first determining whether the candidates in question are disabled within the meaning of the ADA is inexplicable.

Likewise is EEOC's pursuit of punitive damages against Hunt in the absence of proof that Hunt intentionally or even recklessly discriminated against the disabled when it developed the DRL as a safety-based standard which applicants in many cases met by providing a certified medical release. Hunt's averment that it believed DOT regulations not only allowed, but required, it to institute some kind of medication screening policy—even if various medications it deemed unacceptable were not automatically prohibited by DOT—has never been controverted by EEOC. Aside from conclusory allegations regarding Hunt's unspecified "fears, myths and generalizations" about the claimants, there is no evidence that even one of the 540 claimants in the class EEOC purports to represent in this action was either disabled, regarded as disabled or had a record of disability as contemplated by the ADA.

Based on the foregoing is it hereby

ORDERED that plaintiff's motion for summary judgment is DENIED, and it is further

ORDERED that defendant's cross-motion for summary judgment is GRANTED, and it is further ordered that the complaint is hereby dismissed in its entirety with prejudice.

IT IS SO ORDERED.