Richard BAULOS and Stanley Schneider, Plaintiffs–Appellants,

v.

ROADWAY EXPRESS, INC., Defendant–Appellee.

No. 97–2880.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 28, 1998.

Decided March 24, 1998.

Terry R. Boesch (argued), Valparaiso, IN, for Plaintiffs–Appellants.

Michael A. Warner, Jr. (argued), Franczek, Sullivan, Mann, Crement, Hein & Relias, Chicago, IL, for Defendant–Appellee.

Before ESCHBACH, MANION, and KANNE, Circuit Judges.

MANION, Circuit Judge.

Richard Baulos and Stanley Schneider alleged that they were discriminated against in violation of the Americans with Disabilities

Act (ADA), 42 U.S.C. § 12101 *et seq.* The district court granted Roadway Express' (Roadway) motion for summary judgment finding that the plaintiffs were not disabled or regarded as disabled, and denied plaintiffs' motion for summary judgment.[1] Baulos and Schneider appeal. We affirm.

## I.

Richard Baulos and Stanley Schneider began working as truck drivers for Roadway in August 1992 and January 1993, respectively. In 1994, Roadway incorporated a system known as "sleeper duty" into its operations. Under the sleeper system, truck drivers would drive with a partner. One of the partners would drive while the other would sleep for five to eight hours in the adjacent sleeper cab of the truck. The drivers would then switch positions, thereby preventing the need to spend a night in a motel and avoiding the risk of a single individual driving for too long and falling asleep at the wheel. Sleeper teams were used for truck drivers making long hauls, those over 500 miles, while single drivers were used for shorter distances. Roadway used this arrangement to increase efficiency and improve customer service.

Semi-annually drivers bid for either single-driver, sleeper duty, or a combination of both positions depending on Roadway's varying needs. Plaintiffs both lacked the seniority to successfully bid for single-driver positions.

Prior to his employment with Roadway, Baulos developed a chronic kidney-stone problem. His problem was so severe that on average he passed at least one kidney stone each year. In order to address his urinary tract disorder, Baulos drank two gallons of water a day, took a diuretic, and was prescribed potassium pills. Baulos' need to frequently urinate, approximately every half-hour to two hours, combined with the bumpy ride in the sleeper cab prevented him from getting much sleep. At first he tried urinating into a container while inside the cab so that it would not have to stop, but Roadway subsequently sent a memo to all drivers notifying them that they could no longer urinate inside the truck at any time. Baulos con-

tends that when he was placed on sleeper duty he suffered from a limited sleep disorder, which ultimately became so grave that he began falling asleep while driving. On September 11, 1995, Baulos was placed on an extended leave of absence because he informed management that he could no longer drive sleeper trucks and submitted a letter from his doctor that stated that he could not get sufficient sleep under his current assignment which resulted in sleep deprivation and exhaustion.

In light of his alleged problems, Baulos asked to be taken off sleeper duty and assigned only to shorter, single-driver shifts or various other non-driving positions. Roadway's management informed Baulos that he could not be taken entirely off of sleeper duty because of the union's seniority scheme. Baulos later filed a grievance with his union in a second attempt to be taken off sleeper duty. The union's reviewing body rejected Baulos' request and his grievance was then taken to the next step of being presented to the Joint Area Committee (JAC), which was comprised of three union and three management representatives. The district court found and Roadway asserts that the JAC determined at their December 6, 1995 meeting that Baulos should be offered a specially designed urinal apparatus to use in the sleeper cab as an accommodation. The district court stated that "[s]uch an accommodation was unsatisfactory in Baulos' eyes and, therefore, he never drove for Roadway." However, Baulos argues that neither this accommodation nor any others were offered to him.

On December 6, 1995, Roadway sent a certified letter to Baulos at his residence requesting updated medical information so that it could determine if he was able and willing to return to work. This letter stated that if Baulos failed to provide the requested information within 10 days Roadway would remove him from the company's seniority list. Baulos and his wife refused to sign for and accept this letter. Thereafter, Baulos' wife accepted a certified letter dated Decem-

---

1. Plaintiffs also alleged a claim under Indiana state law for intentional infliction of emotional distress, which the court dismissed without prejudice for lack of supplemental jurisdiction.

ber 19, 1995, from Roadway, which stated that Baulos was removed from the seniority list for failing to respond to its request for updated health information.

Schneider began driving on sleeper duty in October 1994. Like Baulos, Schneider quickly developed a limited sleep disorder. As a result of the bumpy ride, cramped quarters, constant noise, and his driving partner's smoking and flatulence, Schneider became so exhausted when he was on sleeper duty that he developed heart attack-like symptoms. After Schneider's doctor submitted a report stating that Schneider was "temporarily unsafe to drive," Roadway pulled him off of all driving duties. Several days later Schneider submitted a revised statement from his doctor that stated that it was unsafe for him to drive only when he was on sleeper duty. Schneider informed Roadway that his disorder only manifested itself when he drove sleeper duties and that he would be fine if he was assigned only to single-man trucks. Once again, Roadway management informed Schneider that because of the union's seniority scheme they could not exempt him from all sleeper duty.

In September 1995, Schneider wrote to Roadway requesting accommodations. In this letter Schneider offered to try and continue performing sleeper duties if Roadway installed an air-ride suspension in the sleeper, as well as a Jake brake [2] if the trip would entail crossing the Rocky Mountains. Roadway did not respond to this request for accommodation.

In December 1995, Roadway removed Schneider's name from the drivers list because he had failed to respond to their request for updated health information. However, Schneider contends that he personally drove medical reports to Roadway and then sent them by fax a second time, but that Roadway never acknowledged receiving these documents. Roadway states that it did not receive this information. The information that Schneider allegedly sent only included a current electrocardiograph and the statements that were previously submitted from his doctor in September 1995. Schneid-

er also alleged that he stated that his condition was unchanged from September.

Like Baulos, Schneider filed a grievance with the union but subsequently postponed the grievance hearing indefinitely because he decided to pursue his dispute with Roadway through his attorney rather than the union. Subsequent to their dismissal from Roadway both plaintiffs obtained employment driving trucks with other companies.

The district court found that Baulos and Schneider did not raise a genuine issue of material fact as to whether they had an impairment that substantially limited their major life activity of the ability to work. The court also found that Roadway did not regard them as having such an impairment. The district court found that plaintiffs' inability to perform only the particular job of driving sleeper trucks was insufficient to establish a substantial limitation on their ability to work. On appeal Baulos and Schneider argue that they raised a genuine issue of material fact as to whether they were disabled or regarded as disabled. Roadway disputes these contentions and also asserts that summary judgment was appropriate on two alternative grounds not considered by the district court—namely, that Baulos and Schneider were not qualified for their positions because they could not perform sleeper duty and were responsible for the breakdown in the interactive accommodation process.

## II.

■■■ This court reviews a district court's grant of summary judgment de novo. *Venters v. City of Delphi*, 123 F.3d 956, 962 (7th Cir.1997); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir.1997). "Summary judgment is appropriate when the record, viewed in a light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Vector–Springfield Properties, Ltd. v. Central Ill. Light Co., Inc.*, 108 F.3d 806, 809 (7th Cir.1997) (citing Fed.R.Civ.P. 56(c)). In order for a party "to avoid summary judgment that party must supply evidence suffi-

---

**2.** A Jake brake is installed on the engine to protect the brakes.

cient to allow a jury to render a verdict in his favor." *Williams v. Ramos*, 71 F.3d 1246, 1248 (7th Cir.1995). The mere existence of some alleged factual dispute is insufficient to defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

■ As a preliminary matter, the parties dispute whether Baulos was actually offered the accommodation of a urinal apparatus being placed in the truck that he used for sleeper duty. The district court found that it was offered to him and that he found it unacceptable. There is nothing in the record to support this finding. Baulos did not attend the December 6, 1995 JAC meeting because it was held in Florida, but did obtain a transcript of the meeting. He asserts that this transcript shows that a doctor at the JAC meeting suggested that Baulos be offered the urinal apparatus so that he could return to work, however there is nothing in the record that shows that the JAC adopted this suggestion and offered it to Baulos. Baulos also states that even if such an accommodation had been offered to him it would have been insufficient to address his sleep deprivation problem because he would still have to wake up about every hour to go to the bathroom. Viewing the record in the light most favorable to Baulos, as this court must, this court concludes that the accommodation was never offered to Baulos. *Vector–Springfield Properties*, 108 F.3d at 809.

■ In order for a plaintiff to recover under the ADA for an employer's failure to reasonably accommodate he must show "(1) that he 'was or is disabled' as defined by the Act, (2) that [his employer] was aware of this disability, and (3) that he was 'qualified' for the position in question." *Best v. Shell Oil Co.*, 107 F.3d 544, 547–48 (7th Cir.1997). Under the ADA, a disability is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g). Major life activities are defined to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). An impairment rises to the level of a disability under the ADA only if it "substantially limits" a major life activity.[3] *Roth v. Lutheran General Hosp.*, 57 F.3d 1446, 1454 n. 12 (7th Cir. 1995).

■ Baulos and Schneider argue that their sleep disorders substantially limit the major life activity of working. Roadway argues that plaintiffs were unable to perform one particular job for them, driving sleeper trucks, and that this is insufficient to establish a disability under the ADA.[4]

■ "It is now well-established that an inability to perform a particular job for a particular employer is not sufficient to establish a substantial limitation on the ability to work; rather, the impairment must substantially limit employment generally." *Homeyer v. Stanley Tulchin Assoc., Inc.*, 91 F.3d 959, 961 (7th Cir.1996) (internal quotations omitted); *see Roth*, 57 F.3d at 1454–55. With respect to the major life activity of working,

> [t]he term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having compa-

---

3. Factors to be considered by the court in determining whether an impairment results in a substantial limitation on a major life activity are: (1) the nature and severity of the impairment; (2) the actual or expected duration of the impairment; and (3) the anticipated or actual permanent or long-term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2); *see Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 506 n. 3 (7th Cir.1998).

4. Roadway additionally argues that plaintiffs' impairment was not covered by the ADA because it was temporary. Under the ADA "[i]ntermittent, episodic impairments are not disabilities." *Vande Zande v. Wisconsin Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir.1995). However, plaintiffs' sleep deprivation problem occurred each time they drove a sleeper truck and therefore does not neatly fall into the traditional definition of temporary. 29 C.F.R. Pt. 1630, App. § 1630.2(j).

rable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i); *see Davidson,* 133 F.3d at 506; *Roth,* 57 F.3d at 1454–55 (inability to fulfill long shifts or 36–hour call duties required of desired employment position is not a disability).

Additional factors that may be considered in determining whether an individual is substantially limited in the major life activity of working include: (1) the geographical area that is reasonably accessible to the individual; (2) the job that the individual has been disqualified from because of an impairment, and the amount and types of positions within the individual's geographical area that utilize similar training, knowledge, skills or abilities, from which the individual is also disqualified because of the impairment (class of jobs); and/or (3) the job that the individual has been disqualified from because of an impairment, and the amount and types of other positions within the individual's geographical area that do *not* utilize similar training, knowledge, skills or abilities, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).[5] 29 C.F.R. § 1630.2(j)(3)(ii); *see Davidson,* 133 F.3d at 506 n. 4.

To support their argument that they have a disability, plaintiffs cite only to *Best,* 107 F.3d at 548. In *Best,* this court addressed the same issue presented here: whether the claimants' impairment "substantially limited the major life activity of working, or if it simply prevented him from performing one narrow job for one employer." *Best,* 107 F.3d at 548. The plaintiff in *Best* suffered a knee injury that, even after surgery, caused him pain when he drove trucks that did not have a specially modified seat that provided extra leg room to operate the clutch. Best's employer accommodated him with a different seat which appeared to address the problem.

However, the employer ultimately placed Best on leave without pay in reliance on statements from a doctor and driver performance evaluator that Best should find other work and was not safe to drive. *Id.* This court found that these statements and those of his employer raised a genuine issue that Best would commonly face the same clutch and seat problems in many truck driving positions (class of jobs). *Id.* Further, these same statements raised a genuine issue that Best's employer regarded him as disabled.

Despite the initial similarity between *Best* and this case, in that they both involve truck driving positions, they are easily distinguishable. Unlike in *Best,* Roadway and the doctors that it relied on have not indicated that plaintiffs would experience the same disqualification in other truck driving positions. Roadway has repeatedly asserted that plaintiffs' inability to perform the particular position with it related solely to their problems relating to sleeper duty. Roadway has not asserted that they were incapable of driving single-person truck shifts. The precise issue of whether a truck driver's inability to drive sleeper trucks is a substantial limitation on his ability to work in general was addressed by a court in *Maloney v. ANR Freight System,* 16 Cal.App.4th 1284, 1287, 20 Cal. Rptr.2d 656 (1993). The court concluded that a driver with only one functioning kidney whose condition precluded him from driving sleeper trucks, but not single-driver trucks, did not have a disability under California's analog to the ADA because he was able to work elsewhere in his chosen profession. *Id.* at 1288, 20 Cal.Rptr.2d 656.

In their reply brief, Baulos and Schneider argue that their sleep disorder impairment would exist in most other truck driving positions. They speculate that "due to the apparent success [Roadway] has reaped because of the sleeper teams, logically the majority (if not all) of the large trucking

---

5. According to the Appendix to the regulations relating to the ADA:

> The terms "number and types of jobs" and "number and types of other jobs," as used in the factors discussed above, are not intended to require an onerous evidentiary showing. Rather, the terms only require the presentation of evidence of general employment demographics and/or of recognized occupational classifications that indicate the approximate number of jobs (e.g., "few," "many," "most") from which an individual would be excluded because of an impairment.

29 C.F.R. Pt. 1630, App. § 1630.2(j).

companies are transforming their fleets to the sleeper-team concept as well." They also state that four out of the five largest trucking companies use sleeper teams (Roadway, CF, Yellow, and Schneider). However, this speculation and unsupported statement, even accepting that it is true, do not support a finding that Baulos and Schneider are disqualified from a class of jobs or a broad range of jobs in various classes. This employment information relates only to large trucking companies and thereby excludes all other truck driving positions that would be considered in the same class as their former positions with Roadway. As in *Davidson*, this court should find it "somewhat unlikely that *all* employers" of truck drivers would require sleeper duty. *Davidson*, 133 F.3d at 507. Unlike in *Best*, the record before this court does not contain evidence that indicates that plaintiffs would have difficulty obtaining any truck driving positions because of their inability to drive on sleeper duty. *Best*, 107 F.3d at 548. In fact, both Baulos and Schneider subsequently obtained truck driving positions that did not entail sleeper duty or result in sleep deprivation.[6]

If a job keeps drivers awake, and in turn causes some sort of sleep deficit disorder, it is pretty obvious that the job is the problem, not that the drivers are disabled. The drivers were told they were supposed to sleep in the back of a moving truck where sleeping conditions are poor if not impossible. The deprivation of sleep was basically inevitable, although there may be a minority of drivers who can tolerate and perhaps even thrive under these harsh sleeping conditions. In fact, rather than a disability that requires accommodation, this appears to be a potential safety hazard emerging in the trucking industry.

Additionally, when plaintiffs are compared to the average person with comparable training and abilities, pursuant to 29 C.F.R. § 1630.2(j)(3)(i), their situation cannot be viewed as being much different. Baulos himself stated in his affidavit that "[o]f the driv-

ers assigned to the sleeper trucks, 87% of the Chicago Heights drivers would admit they were uncomfortable with the accommodations in the sleepers. All 700 drivers would admit [that] driving the sleeper trucks results in lack of sleep, increased stress and decreased ride quality." Sleep deprivation problems were common among truck drivers assigned to sleeper duty. This stands in contrast to the situation in Best because Best suffered from a unique impairment, whereas plaintiffs' impairment is widely shared by other truck drivers that are assigned to sleeper duty. Therefore, Baulos and Schneider failed to present sufficient evidence that they are disqualified from a class or broad range of jobs based on their impairment compared to the average person with comparable skills. 29 C.F.R. § 1630.2(j)(3)(i); *Francis v. City of Meriden*, 129 F.3d 281, 286 (2d Cir.1997) (the purposes of the ADA would be debased " 'if the statutory protections available to those truly handicapped could be claimed by anyone whose disability was minor and whose relative severity of impairment was widely shared' " (quoting *Forrisi v. Bowen*, 794 F.2d 931, 934 (4th Cir.1986))); *see Williams v. City of Charlotte*, 899 F.Supp. 1484, 1488 (W.D.N.C.1995) (summary judgment appropriate against a claimant who suffers from "shift work sleep disorder" because it is a commonplace condition for night shift workers).

Baulos and Schneider's inability to drive sleeper trucks because of sleep deprivation does not disqualify them from a similar class of truck driving jobs that do not include sleeper duty. Additionally, lack of sleep is a common ailment suffered by a majority of truck drivers assigned to sleeper duty. Therefore, plaintiffs do not have an impairment that substantially limits the major life activity of working.

### III.

Baulos and Schneider also argue that they are disabled under the terms of the ADA because Roadway regarded them as

---

6. Although plaintiffs were engaged in the same type of employment after being discharged because of an alleged disability, this alone is not

conclusive that they do not suffer from a substantial limitation in the major life activity of work. *Best*, 107 F.3d at 545.

disabled. "The 'regarded as' portion of the ADA was designed to combat erroneous stereotypes that employers may have about impairments that are not, in themselves, substantially limiting." *Harrington v. Rice Lake Weighing Sys., Inc.*, 122 F.3d 456, 459 (7th Cir.1997). The "regarded as" requirements can be met in three different ways:

(1) The individual may have an impairment which is not substantially limiting but is treated by the employer or other covered entity as constituting a substantially limiting impairment;

(2) The individual may have an impairment which is only substantially limiting because of the attitudes of others toward the impairment; or

(3) The individual may have no impairment at all but is regarded by the employer or other covered entity as having a substantially limiting impairment.

*Id.* at 459–60; *see* 29 C.F.R. § 1630.2(*l*).

In support of their argument that Roadway regarded them as disabled, plaintiffs once again cite to only one case, *Johnson v. American Chamber of Commerce Publishers, Inc.*, 108 F.3d 818 (7th Cir.1997). *Johnson* clearly holds that claimants do not have to have an actual impairment to be regarded as disabled. *Id.* at 819. However, *Johnson* does not lend any support to plaintiffs' argument that Roadway regarded them as disabled.

The remainder of plaintiffs' argument is that Roadway viewed them as unable to drive any trucks, rather than just sleeper duty trucks, and thereby regarded them as disabled. This argument is not supported by the record. Roadway acknowledged that plaintiffs could drive single-driver trucks but stated that the only positions that plaintiffs had sufficient seniority to receive included sleeper duty.[7] The fact that most drivers with seniority avoid the team trips indicates that most drivers do not like the concept, no doubt for reasons similar to those expressed by Baulos and Schneider. This situation is

different than in *Best* where the employer indicated that it did not believe that Best was capable of driving any truck. *Best*, 107 F.3d at 548–49. "Courts have uniformly held 'that an employer does not necessarily regard an employee as handicapped simply by finding the employee to be incapable of satisfying the singular demands of a particular job.'" *Byrne v. Board of Educ., Sch. of West Allis–West Milwaukee*, 979 F.2d 560, 567 (7th Cir. 1992) (quoting *Forrisi*, 794 F.2d at 934); *see Gupton v. Virginia*, 14 F.3d 203, 205, 205 n. 3 (4th Cir.1994) (citing cases). Therefore, we conclude that plaintiffs have failed to raise a genuine issue of material fact as to whether Roadway regarded them as disabled.

## IV.

Plaintiffs neither had an impairment that substantially limited their ability to perform the major life activity of working nor were regarded as having such an impairment by Roadway. The record does not support a finding that plaintiffs' impairment of driving sleeper trucks would disqualify them from most other truck driving positions (class of jobs). Baulos and Schneider were merely unable to perform the particular position at Roadway that entailed driving sleeper trucks. Additionally, the majority of truck drivers assigned to sleeper duty had difficulty getting sufficient rest, as would most members of the general public. Having reached this determination we need not consider the additional grounds suggested by Roadway for affirming the judgment of the district court.

Affirmed.

---

7. Even if plaintiffs' impairment actually was a covered disability, this court has held that "the ADA does not require disabled individuals to be accommodated by sacrificing the collectively bargained, bona fide seniority rights of other employees." *Eckles v. Consolidated Rail Corp.*, 94 F.3d 1041, 1051 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1318, 137 L.Ed.2d 480 (1997).