**EQUAL EMPLOYMENT OPPOR-
TUNITY COMMISSION,
Plaintiff–Appellant,**

v.

**J.B. HUNT TRANSPORT, INC.,
Defendant–Appellee.**

**Docket No. 01–6084.**

United States Court of Appeals,
Second Circuit.

Argued: Jan. 9, 2002.

Decided: Feb. 5, 2003.

Julie L. Gantz, Equal Opportunity Employment Commission (Nicholas M. Inzeo, Acting Deputy General Counsel, Philip B. Sklover, Associate General Counsel, Vincent J. Blackwood, Assistant General Counsel, on brief), for Plaintiff–Appellant.

James H. Hanson, Scopelitis, Garvin, Light & Hanson, Indianapolis, IN (Laurie T. Baulig, Scopelitis, Garvin, Light & Hanson, Washington, DC, Thomas J. Grooms, Bond Schoeneck & King, Syracuse, NY, on brief), for Defendant–Appellee.

Before: JACOBS, F.I. PARKER, SOTOMAYOR, Circuit Judges.

F.I. PARKER, Circuit Judge.

J.B. Hunt Transport, Inc. chose not to employ over-the-road truck drivers who used prescription medications with side effects that might impair driving ability. The Equal Employment Opportunity Commission argued that under the Americans with Disabilities Act, Hunt's decision violated the rights of job applicants using those medications. We disagree.

## I.

Plaintiff–Appellant Equal Employment Opportunity Commission ("EEOC") appeals from the February 8, 2001 decision of the United States District Court for the Northern District of New York (Norman A. Mordue, *Judge*) granting defendant J.B. Hunt Transport Inc.'s ("Hunt"'s) motion for summary judgment and denying plaintiff EEOC's cross-motion for summary judgment. The district court found that the applicants in question had been denied over-the-road driving positions with Hunt because of their use of medications with potentially harmful side effects, and not as a result of an actual or perceived disability or a record of disability as contemplated by the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* ("ADA"). On appeal, the EEOC argues exclusively that Hunt regarded the rejected applicants as disabled, i.e., substantially limited from a major life activity, as defined by 42 U.S.C. § 12102(2)(C) because of their use of certain medications. Because we find that Hunt did not regard the applicants as disabled as defined by the ADA, we affirm the decision of the district court.

## II.

J.B. Hunt Transportation, Inc. ("Hunt") is the nation's largest publicly held motor carrier company. Hunt operates for-hire property transport services in the forty-eight contiguous states, the District of Columbia, Canada, and Mexico. Its fleet includes 8,000 tractors, and it employs approximately 12,000 individuals to drive the trucks. Of these employees, approximately 10,000 are the over-the-road ("OTR") drivers whose positions are at issue in this case. These OTR drivers operate vehicles weighing approximately 80,000 pounds over irregular routes under particularly difficult work conditions, including sleep deprivation, irregular work and rest cycles, inclement weather, long driving periods, long layovers, irregular meal schedules, tight delivery schedules, en route delays, night driving, accumulated fatigue, stress, and extended periods of loud noise and vibrations. According to Hunt, the large vehicle size and extreme driving conditions faced by its OTR drivers warrant heightened safety evaluations of those OTR drivers.

Like other motor carriers, Hunt is subject to federal regulation under the Department of Transportation's Federal Motor Carrier Safety Act Regulations ("FMCSAR"). 49 C.F.R. § 301, *et seq.* (2001). These regulations establish minimum qualifications for any person driving a commercial motor vehicle, as well as minimum duties for motor carriers using OTR drivers. The regulations specifically allow an operator to require and enforce "more stringent requirements relating to safety of operation and employee safety and health", 49 C.F.R. § 390.3(d), and require operators to restrict drivers from operating vehicles "while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle." *Id.* at § 392.3 (2001). A motor carrier is required to ensure that drivers do not operate unless they are in compliance with the DOT regulations. 49 C.F.R. §§ 391.11, 392.3, 392.4(b)(2001).

A. The Drug Review List

Between September 1993 and May 1994, in an effort to comply with the FMCSAR in its hiring processes, Hunt created a Drug Review List ("DRL") of medications known to have side effects that might impair driving ability. The list, thirty-seven pages in length and including over 836 medications, was compiled by Hunt's Safety Department Director of Compliance, David Whiteside

("Whiteside"), based entirely on notations in the 1993 edition of the Physician's Desk Reference ("PDR"). Whiteside divided the DRL into six columns labeled "name," "class," "comment," "restriction," "treats," and "1993 PDR page number." In the "restriction" column, Whiteside indicated the impact a particular drug might have on an applicant's eligibility. Whiteside designated five categories of restrictions: "Rule Out Side [E]ffects," "Not Permitted," "Unsafe [E]ffects," "Heart Condition," and "Disqualifying Condition." [1] An applicant whose medication had a "Rule Out Side Effects" notation was required to obtain a release from the prescribing doctor certifying that the applicant could safely drive a tractor trailer truck while using the medication. An applicant taking a "Not Permitted," "Unsafe Effects," "Disqualifying Condition," or "Heart Condition" medication could not drive for Hunt while using the indicated medication.[2] The notation "Unsafe Effects" indicated either that the PDR cautioned users against operating heavy equipment or driving automobiles while taking the drug (noted as "warning on driving" in the comment column) or that the drug caused drowsiness, sedation, or a high incidence of dizziness. A "Rule Out Side Effects" notation indicated that a medication could cause side effects similar to, but less pervasive than, those warranting an "Unsafe Effects" label. Finally, "Heart Condition" indicated that the medication was generally used for heart problems that could disqualify drivers under DOT regulations.

---

1. The Court will use the corrected labels "Rule Out Side Effects" for "Rule Out Side Affects" and "Unsafe Effects" for "Unsafe Affects" throughout the opinion.

2. The district court found that Whiteside mistakenly believed that the DOT prohibited drivers from using any Schedule II–V medications, rather than only Schedule I medications, and that he therefore included all of

these medications in the "Not Permitted" category. *Equal Employment Opportunity Comm'n v. J.B. Hunt Transp., Inc.,* 128 F.Supp.2d 117, 120 n. 2 (N.D.N.Y.2001); *see* 49 C.F.R. § 391.42(b)(12)(i) (prohibiting use of Schedule I drugs, amphetamines, narcotics, and other habit-forming drugs); 49 C.F.R. § 392.2 (same).

## B. The Hunt Hiring Process

Upon receiving an application for a commercial driving position, Hunt forwarded the application to its Corporate Driver Personnel Department in Lowell, Arkansas for screening of motor vehicle, criminal, and prior employment records and for a review of listed references. If an applicant passed this first level of screening and received a conditional employment offer, the applicant underwent medical screening, including questioning regarding the applicant's use of prescription medication for the last five years. Hunt used non-medical personnel to conduct these screenings. If the applicant indicated use of a prescription drug, the reviewing employee consulted Hunt's medical guidelines[3] and the DRL to determine the applicant's medical eligibility.

## C. The EEOC Claim

EEOC claims that Hunt improperly rejected 546 applicants in violation of the ADA on the basis of a "blanket" exclusionary policy. EEOC admits, however, that Hunt hired several applicants who were using drugs prohibited under the DRL—in 1995, two applicants using drugs labeled "Disqualifying Condition" and eleven using drugs labeled "Unsafe Effects," and in 1996 and 1997, one applicant taking a "Disqualifying Condition" drug and thirteen using drugs with "Unsafe Effects." Prior to commencing work, each of these new employees provided Hunt with medical documentation from a treating physician or health care provider certifying that he or she did not suffer from the potentially problematic side effects and could operate a truck safely while taking the drug.

## III.

EEOC filed its complaint in the United States District Court for the Northern District of New York on October 24, 1997. Both sides moved for summary judgment. EEOC alleged that Hunt violated the ADA by discriminating against individuals with disabilities or "perceived" disabilities. Hunt alleged that the DRL was a safety-related qualification standard addressing serious business concerns. The district court granted summary judgment for Hunt and denied EEOC's summary judgment motion based on (1) its conclusion that ADA protections did not extend to the excluded driver-applicants because the applicants were not, by virtue of their use of certain medications, disabled within the meaning of the ADA, and (2) its finding that the EEOC had failed to contradict Hunt's assertion that its use of the DRL as a safety measure was reasonable within DOT guidelines. *Equal Employment Opportunity Comm'n. v. J.B. Hunt Transp., Inc.,* 128 F.Supp.2d 117, 135–36 (N.D.N.Y. 2001). On appeal, EEOC abandoned its argument that the excluded applicants were "disabled" under the ADA, claiming only that the district court erred by granting summary judgment to Hunt when the evidence supported the conclusion that Hunt regarded the applicants as disabled because of their use of medications on the DRL.

## IV.

We review a district court's grant of summary judgment de novo, construing the evidence presented below in the light most favorable to the non-moving party. *Manning v. Utils. Mut. Ins. Co.,* 254 F.3d 387, 391 (2d Cir.2001). While

---

**3.** As the district court found, Hunt maintained a restrictive policy on the use of drugs for psychological conditions separate from the DRL. An applicant was not eligible to drive for Hunt unless he or she had been off such drugs for at least thirty days before commencing work. Hunt Medical Guidelines, April 11, 1996.

this Court may affirm on any ground with adequate support in the record, we may not affirm summary judgment where any evidence in the record would support a reasonable inference in favor of the opposing party. *See McCarthy v. Am. Int'l Group, Inc.,* 283 F.3d 121, 124 (2d Cir. 2002); *VKK Corp. v. Nat'l Football League,* 244 F.3d 114, 119 (2d Cir.2001).

### A. The Statutory Framework and the Definition of "Disability."

The ADA provides a deceptively simple definition of disability:

The term "disability" means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2)(1995). EEOC regulations further develop this definition, explaining "physical or mental impairment" as:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h) (2001).

Although EEOC initially challenged Hunt's reliance on the DRL under all three prongs of the statutory definition of "disability," on appeal, EEOC alleges only that the rejected OTR driver applicants were "regarded as" disabled by Hunt based on their use of certain medications, invoking the statutory definition of disability under § 12102(2)(C). As the Supreme Court explained in *Sutton v. United Air Lines, Inc.,* "[t]here are two apparent ways in which individuals may fall within this [§ 12102(2)(C)] statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

Evaluating the evidence before the district court, this Court agrees with the court below that EEOC failed to put forth evidence sufficient to demonstrate that the rejected applicants were "disabled" within the meaning of the ADA. Specifically, EEOC failed to set forth evidence sufficient to establish that Hunt perceived rejected applicants as substantially limited in their ability to perform a major life activity.

### B. The Evidence Is Insufficient To Support the Inference that Hunt Regarded Applicants as Having a "Substantial Limitation" on a "Major Life Activity."

To qualify for ADA protections, a person's "impairment" must "substantially limit" a "major life activit[y]." 42 U.S.C. § 12102(2). Major life activities may include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning," and, pertinent to this appeal, "working." 29 C.F.R. § 1630.2(i). An activity is "substantially limited" when an individual cannot per-

form the activity that an average person in the general population could perform or faces significant restrictions in the "condition, manner, or duration under which the individual can ... perform [the] activity." 29 C.F.R. § 1630.2(j)(i)-(ii). The activity of "working" is further defined by the regulations as follows:

> With respect to the major life activity of *working*—
>
> (i) The term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i). Thus, unless Hunt perceived the applicants in question as limited from a class of jobs or a broad range of jobs, the EEOC's claim must fail.

### 1. Driving 40–Ton, 18–Wheel Trucks Over Long Distances for Extended Periods is Neither a "Class of Job" nor a "Broad Range of Jobs" Within the Meaning of the ADA.

■ Driving freight-carrying tractor-trailer trucks over long distances for extended periods of time is neither a "class of jobs" nor a "broad range of jobs," as the EEOC alleges, but rather a specific job with specific requirements. Such a position requires specific abilities, especially the ability to stay alert over long hours under difficult conditions. A Hunt OTR driver's alertness cannot flag. He or she must be able to stay alert and withstand the mesmerizing affect of driving an eighteen-wheel vehicle for hours at a stretch, sometimes at night, with continuous vibration over long distances. Given these demanding requirements, the fact that one may not be able to perform the specific job

of a Hunt OTR driver does not mean that one could not successfully engage in other types of truck driving, let alone in other kinds of safety-sensitive work.

In *Sutton*, the Supreme Court considered the claims of pilots who had been denied positions as "global pilots" with United Airlines. The Supreme Court held that the position of "global pilot" was "a single job" and, therefore, was not sufficiently broad to satisfy the "major life activity requirement". *Sutton*, 527 U.S. at 493, 119 S.Ct. 2139. The Court reasoned that "there are a number of other positions utilizing petitioners' skills, such as regional pilot and pilot instructor to name a few." *Id.*

Like the limitation that United Airlines placed on global airline pilots in *Sutton*, the limitation that Hunt placed on applicants for the position of OTR driver was a limitation on a particular job within a larger group of jobs, and not a substantial limitation on working. *See Baulos v. Roadway Express, Inc.*, 139 F.3d 1147,-1154 (7th Cir.1998) (driving sleeper trucks is a specific job within the broader class of truck driving jobs). Therefore, the applicants' perceived unsuitability for the position of OTR driver cannot be characterized as a perceived inability to perform a broad range or a class of jobs. This is true even assuming that truck-driving in general is a sufficiently broad range or class of jobs to constitute a "major life activity", an issue we do not need to reach. As the dissent readily acknowledges, persons licensed to drive the types of vehicles driven by Hunt OTR drivers are also qualified to drive "various types of small and large trucks, including tractor-trailers, moving trucks, and cargo vans." Dissent page 80.

Accordingly, to show that Hunt perceived applicants rejected under the DRL as substantially limited in a major life ac-

tivity, the EEOC must show that Hunt viewed such applicants as limited from a broader range or class of jobs than merely OTR positions at Hunt.

2. The Evidence Is Not Sufficient To Support a Reasonable Inference that Hunt Regarded Applicants Rejected Under the "Not Permitted" and "Unsafe Effects" Categories as Substantially Limited in a Broad Range or Class of Jobs.

■ The EEOC argues that Hunt regarded applicants who took particular medications as incapable of driving trucks, which according to the EEOC constitutes either a "class of jobs" or a "broad range of jobs." The record, however, only shows that Hunt saw the applicants as unfit to perform a job for which they were seeking applicants: long-distance, freight-carrying, tractor-trailer driving. The Supreme Court has clearly stated that "[t]he inability to perform a single, particular job," however, "does not constitute a substantial limitation in the major life activity of working." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 493, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). Here, Hunt dismissed the applicants as unable to meet Hunt's own safety requirements—requirements above and beyond the DOT's industry-wide standards and unique from the requirements of other trucking companies. *See* Compl. ¶ 8c; Def.'s Statement of Material Facts at 7; *see also* Adair Dep. at 85–86; *J.B. Hunt Transp., Inc.*, 128 F.Supp.2d at 129 n. 17 (noting drivers were employed by other trucking companies while taking same medications).

The evidence suggests that Hunt found the applicants unsuited for long-distance driving of Hunt's 40–ton trucks on irregular, stressful schedules, but does not indicate that Hunt perceived the applicants as more broadly limited. The fact that Hunt did not have another, less demanding driving position to offer the candidates does not indicate that Hunt perceived the candidates as being unqualified for any driving position at all. *Giordano v. City of New York*, 274 F.3d 740, 748–50 (2d Cir.2001) (finding inability of the New York Police Department to offer light duty, non-patrol position to officer taking anti-coagulation medication did not demonstrate that officer was substantially limited in working where other security and law enforcement jobs in the area had such positions); *see also Baulos v. Roadway Express Inc.*, 139 F.3d 1147, 1154 (2d Cir.1998) (concluding that truck drivers unable to operate sleeper trucks did not show that they were regarded as disabled where employer did not offer them less demanding, non-overnight positions that were taken by drivers with more seniority).

■ EEOC references a few comments from Hunt's evaluators to candidates suggesting that certain candidates were not suited to any form of professional driving. These comments, made by people other than the ultimate hiring authorities, simply are not sufficient to indicate that Hunt thought the applicants were more broadly limited given the heightened nature of Hunt's standards and the fact that Hunt did hire some applicants on DRL medications. Although a few evaluators' comments could be more broadly interpreted, there is no evidence that Hunt's reviewers, relying on Hunt's own DRL and drug lists to make a judgment on qualification for a position at Hunt, intended to make an evaluation beyond Hunt's specific guidelines. Nor is there sufficient evidence to support a finding that Hunt viewed the driving limitation as extending beyond Hunt. Furthermore, as the Supreme Court has clearly stated, "[i]t is not enough to say that if the physical criteria of a single employer were *imputed* to all similar em-

ployers one would be regarded as substantially limited in the major life activity of working *only as a result of this imputation.*" *Sutton,* 527 U.S. at 493, 119 S.Ct. 2139.

■ In short, EEOC demonstrated only that Hunt refused to hire certain applicants according to its own hiring criteria; however, a finding of perceived disability may not rest merely on a single employer's failure to hire a candidate. *Baulos,* 139 F.3d at 1154 ("Courts have uniformly held that an employer does not necessarily regard an employee as handicapped simply by finding the employee to be incapable of satisfying the singular demands of a particular job." (internal citation omitted)).

■ Thus, we affirm the district court's grant of summary judgment in favor of Hunt as to the applicants rejected under at least the "Not Permitted" and "Unsafe Effects" categories because EEOC has failed to demonstrate that Hunt mistakenly perceived that the rejected applicants' had impairments that substantially limited a "major life activity." Accordingly, EEOC has failed to show that the applicants were "disabled" within the meaning of the ADA. In so holding, we emphasize that this Court will not presume a mistaken assumption of disability based only on

an employer's decision not to hire certain candidates.

3. The Evidence Is Also Not Sufficient To Support a Reasonable Inference that Hunt Regarded Applicants Rejected Under the "Disqualifying Condition" and "Heart Condition" Categories as Substantially Limited in a Broad Range or Class of Jobs.

As noted above, two of the categories in the DRL appear, at least superficially, to refer to the condition causing the reliance on a DRL drug, not merely the applicants' use of a DRL medication.[4] Although the evidence suggests that these applicants were, like those in the other categories, often told that they were disqualified on the basis of the drug they were using rather than on the basis of the condition supporting their use of the drug, we briefly consider whether applicants using drugs from these two categories warrant a different legal conclusion. We conclude that they do not.

■ Individuals suffering from the conditions treated with the "Heart Condition" or "Disqualifying Condition" drugs are potentially explicitly barred from truck driving by 49 C.F.R. § 391.41.[5] Hunt therefore

---

**4.** As noted in the discussion of the pertinent facts, the DRL contained five categories of drugs: "Rule out Side Effects," "Not Permitted," "Unsafe Effects," "Heart Condition," and "Disqualifying Condition." The EEOC does not represent in this appeal any applicants rejected under the "Rule Out Side Effects" category, thus removing that category from our consideration. *J.B. Hunt Transp., Inc.,* 128 F.Supp.2d at 122, n. 7.

**5.** Review of the DRL reveals that the label "Disqualifying Condition" attached to drugs treating Parkinson's Disease, serious arrythmia, alcoholism, epilepsy, seizure, migraines, dementia, depression, schizophrenia, diabetes, severe arthritis, severe hypertension, opiate addiction, subarachnoid hemorrhage, ar-

tery occlusion, and severe headache, while the label "Heart Condition" attached to medicines treating heart failure, thrombosis, edema, congestive heart failure, ischemia, and ventric arrythmia. 49 C.F.R. § 391.41 appears to exclude persons with all of these conditions from driving a commercial vehicle where those conditions are likely to interfere with their ability to safely drive a commercial vehicle. 49 C.F.R. §§ 391.41(b)(3) (diabetes), 391.41(b)(4) ("myocardial infarction, angina pectoris, coronary insufficiency, thrombosis, or any other cardiovascular disease of a variety known to be accompanied by syncope, dyspnea, collapse or congestive heart failure"), 391.41(b)(6) (high blood pressure), 391.41(b)(7) ("rheumatic, arthritic, orthopedic, muscular, neuromuscular, or vascular

potentially regarded applicants using these drugs as substantially limited not just from driving Hunt vehicles according to the rules of the DRL and other company regulations, but as prevented from driving legally for any commercial trucking company. As with the other categories in the DRL, however, the restrictions on the medications labeled "Disqualifying Condition" or "Heart Condition" were placed on applicants taking the drug, not on applicants with the underlying condition itself. Even though in some cases, the company, under 49 C.F.R. § 391.41, could have created a policy excluding the applicant on the basis of the underlying condition, the basis for the exclusion from employment was the use of a listed drug, not any potential "disability" created by the treated disease.[6]

We conclude, therefore, that any claims arising under the "Heart Condition" and "Disqualifying Condition" categories are not distinguishable from the claims under the "Not Permitted" and "Unsafe Effects" categories and so they must also fail.

---

disease"), 391.41(b)(8) (epilepsy or "any other condition which is likely to cause loss of consciousness"), 391.41(b)(9) ("mental, nervous, organic, or functional disease or psychiatric disorder"), 391.41(b)(12)(i) (controlled substances), 391.41(b)(13) (alcoholism). "Migranes" or "severe headaches," as "vascular headache[s]," DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1042 (28th ed.1994), potentially fall within § 391.41(b)(7)'s restriction on vascular disease.

EEOC alleged that Hunt misinterpreted a DOT report cautioning about the effects of drugs used to treat heart conditions, claiming that the report merely required individual assessment of each patient. The DOT subsequently issued a report clarifying that the use of Coumadin, a anticoagulator previously questioned, was not automatically disqualifying. *J.B. Hunt Transp., Inc.*, 128 F.Supp.2d at 120 n. 3 (describing reports). According to the DRL, however, Coumadin treats thrombosis, a condition specifically prohibited by the

## V.

Although Hunt admittedly rejected the applicants for its OTR driving positions because of their use of certain prescription medications, the EEOC cannot succeed in its ADA claim on behalf the rejected applicants. The record only shows that Hunt regarded the applicants in question as ineligible for a specific position within Hunt, not that Hunt regarded them as "disabled" within the meaning of the ADA. The applicants, through the EEOC, therefore do not have a valid ADA claim.

For the reasons set forth above, this Court affirms the district court's grant of summary judgment to defendant Hunt and its denial of the cross-motion by plaintiff EEOC.

The judgment of the district court is AFFIRMED.

SOTOMAYOR, Circuit Judge, dissenting.

This case is quite straightforward. Based upon a list of drugs and their poten-

---

current regulations. *See* 49 C.F.R. § 391.41(b)(4).

6. For example, Amandtadine Hydrochloride, a drug to which the "Disqualifying Condition" label attaches treats both Parkinson's Disease and the flu. While an applicant taking the drug for Parkinson's might be disabled on the basis of the disease within the meaning of the ADA, an applicant using the drug for the flu would not likely so qualify. Hunt, however, would have excluded either applicant because of the drug usage. Furthermore, some "Disqualifying Condition" drugs treat the same underlying diseases as drugs given other labels. For example Zoloft, a drug used for treatment of, inter alia, depression, is listed as "Unsafe Effects," while Prozac, also for depression, is listed as "Disqualifying Condition." This further supports the idea that the drug, not the condition itself, was the true basis of Hunt's hiring ban.

tial side effects compiled by David Whiteside, a Hunt employee with no medical training, and a Medical Guidelines policy developed by Michael Gray, a former Red Lobster cashier with no medical training who was, nevertheless, Hunt's Medical Advisor, Hunt determined that certain applicants were unfit to be truck drivers. The EEOC has provided substantial evidence that Hunt believed that these individuals were unfit to drive a truck, or, for that matter, to drive at all and were incapable of performing the broad class of jobs that fall under the classification "truck driving." Based upon this showing, I would vacate the district court's grant of summary judgment and hold that there is a genuine dispute of material fact with respect to whether the EEOC has established a prima facie case of disability discrimination. I therefore respectfully dissent.

I agree with the majority that the issue in this appeal is whether the applicants were denied truck driving positions at Hunt because of their perceived disability within the meaning of the ADA. Ignoring significant evidence that Hunt perceived the applicants as more broadly limited, however, the majority holds that the EEOC has only provided evidence that Hunt perceived the rejected applicants as "ineligible for a specific position within Hunt." *Ante* at 78. In doing so, the majority reasons that long haul trucking is not a sufficiently broad class of jobs such that a substantial limitation on an individual's ability to be a long haul trucker would imply that the individual was disabled within the meaning of the ADA. *See ante* at 75–76. The majority asserts that a limitation on an individual's ability to be a long haul truck driver does not substantially limit his or her ability to engage in the major life activity of working, as many other truck driving jobs are available for these individuals. *See ante* at 75–76. The majority does not, however, hold that truck driving in general is such a specific class of jobs that a substantial limitation on truck driving would fail to imply a disability; its holding relies solely upon an inappropriately narrow view that Hunt perceived the applicants as limited only in their ability to work as long haul truckers for Hunt.

Contrary to the majority's assertion, the EEOC has produced significant evidence that Hunt regarded the applicants as substantially limited in the major life activity of working as truck drivers in general. An employer perceives an employee to be substantially limited in his or her ability to work if it believes the employee is:

> significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i); *see also Bartlett v. N.Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 82–83 (2d Cir.2000). Factors that may be considered under this standard include the geographical area to which an individual has reasonable access; the number and types of jobs utilizing similar training, knowledge, skills or abilities as the job from which the applicant has been disqualified; and the number and types of jobs not utilizing similar training, knowledge, skills or abilities from which the applicant will also be disqualified. 29 C.F.R. § 1630.2(j)(3)(ii).

If other jobs utilizing an individual's skills are available, that person is not substantially limited in a class of jobs, even if this alternate employment would not allow the individual to showcase his or her special talents. *Sutton v. United Air Lines,*

*Inc.,* 527 U.S. 471, 492, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). In *Sutton,* the Supreme Court determined that plaintiffs applying for positions as global airline pilots could use their particular skills to obtain other piloting positions from which they were not disqualified, so these plaintiffs were not regarded as being shut out from an entire occupational class. *Id.* at 492–93, 119 S.Ct. 2139. In applying this rubric, the Second Circuit has found that practicing law is a broad occupational class, *see Bartlett,* 226 F.3d at 84, but that working as a policeman is a specific position within the class of investigative or security jobs, *see Giordano v. City of New York,* 274 F.3d 740, 749 (2d Cir.2001).

The EEOC has proffered evidence that the members of the plaintiff class have undergone specialized driver training, earned commercial drivers' licenses, passed road tests and received medical certifications pursuant to DOT regulations. The set of jobs that call for these qualifications includes driving various types of small and large trucks, including tractor-trailers, moving trucks, and cargo vans. *See* Office of Management & Budget, Standard Occupational Classification Manual 220 (2000), *available at* http://www.bls.gov/soc/soc_v3d0.htm. The Department of Labor classifies truck driving as a separate occupation within the overall category of "Transportation and Material Moving Occupations," as does the Office of Management and Budget. *Id.* The Department of Labor estimated that in 2000 there were more than 3.3 million jobs that came under the heading of "Truckdriver and Driver/Sales Workers."[1] Bureau of Labor Statistics, Occupational Outlook Handbook 577 (2002–03), *available at* http://www.bls.gov/oco/pdf/ocos246.pdf.

This evidence demonstrates that truck driving is a general field of employment rather than a specific position. *Accord Baulos v. Roadway Express, Inc.,* 139 F.3d 1147, 1154 (7th Cir.1998) (holding that driving a sleeper car is a specific job within the class of truck drivers); *Best v. Shell Oil Co.,* 107 F.3d 544, 548 (7th Cir. 1997) (holding that truck driving is a class of jobs).

The majority does not reach the question whether truck driving is a class of jobs. Instead, the majority argues that Hunt only dismissed the applicants because "Hunt found the applicants unsuited for long-distance driving of Hunt's 40–ton trucks on irregular, stressful schedules." *Ante* at 76. Such hyperbole is inapposite. Whether long haul trucking is, in fact, different from other types of truck driving is not the central issue in this appeal; Hunt's perception of the applicants as substantially limited in their ability to drive trucks, without further limitation to long haul truck driving, is the central issue.

Beyond this basic misconception, the majority also misrepresents the record by asserting that the evidence "does not indicate that Hunt perceived the applicants as more broadly limited." *Ante* at 77. To the contrary, the EEOC provided significant evidence that Hunt believed that the applicants were unfit to drive trucks. Numerous drugs were listed on the DRL as "Not Permitted,"[2] reflecting a belief that the

---

**1.** Driver/Sales Workers drive trucks and work as sales agents for the goods they haul; both of these aspects are integral to their jobs. *See* Occupational Outlook Handbook 576–77 (2002–03).

**2.** The majority discusses the categories "Not Permitted" and "Unsafe Effects" separately from the two condition-based categories, "Disqualifying Condition" and "Heart Condition." Ultimately, the majority finds no legal distinction between the "condition" categories and the others. *See ante* at 78.

applicant was prohibited by DOT regulations from driving a commercial vehicle while taking that particular medication. Dr. Cooper, Hunt's physician consultant, testified with respect to one applicant that he did not feel it was "in this patient's best interest to pursue this profession." Interview records show that the company believed another applicant "would most likely have difficulty functioning in the lifestyle of a trucker." Similarly, Dr. Cooper indicated with regard to another applicant that her "problems with sleep and concentration under stress are not very compatible with the lifestyle expected of a driver." Applicant Joseph Lisa was told by a Hunt employee that he would "never drive for anybody," and numerous other applicants were told that the medications they were taking made it unsafe for them to drive a truck, or drive in general. *See, e.g.,* Curtin Decl., Exh. 13 (reviewer told applicant "that she could not be on [the medication] and drive [because] it can cause unsafe affect [sic]"); *id.* (reviewer told applicant "that he could not drive[ ] while on this medication"); *id.* (reviewer told applicant "that she cannot be on [the medication] and drive"); Curtin Decl., Exh. 20 (drug is "not permitted for driving"); *id.* ("[b]oth drugs are not approved for driving"); *id.* (reviewer "informed applicant that he can-

---

I agree that all four categories of medications on the DRL at issue here should be treated identically. I disagree, however, with the majority's statement that "the basis for the exclusion from employment was the use of a listed drug, not any potential 'disability' created by the treated disease." *Ante* at 77–78. The EEOC has produced significant evidence that demonstrates the link between the drug categories and potential underlying conditions. For example, one of Hunt's interviewers noted that the "applicant did not indicate the reason he is taking [the medication]. [N]eed to verify why he is on this medication." Similar comments were made by reviewers with respect to applicants taking medications in each of Hunt's categories. *See, e.g.,* Curtin Decl., Exh. 18 (applicant needs to provide "headach [sic] release ... [and a] statement that she is not taking [the medication] for depression") ("Not Permitted" category); *id.* ("Sent to Brenda for review on cardiovasular [sic] condition") ("Not Permitted" category); Curtin Decl., Exh. 20 ("the diagnosis and severity of her condition for which she takes the medication is considered disqualifying") ("Unsafe Effects" category); *id.* (applicant "will need to complete his treatments ... and send in all records when his condition is resolved") ("Unsafe Effects" category); Curtin Decl., Exhs. 23, 25 (applicant needs to "provide a statment [sic] that ... his condition is fine w/out the meds") ("Disqualifying Condition" or "Heart Condition" category); *id.* (Hunt "need[ed] all records on [applicant's] condition") ("Disqualifying Condition" or "Heart Condition" category). In addition, Hunt's Medical Guidelines relating to mental and psychological conditions required that in order to qualify for a job, an applicant taking medication for depression must remain off the medication for thirty days and submit a letter from a doctor stating that he or she no longer suffers from the underlying condition. Contrary to the majority's assertion, this evidence provides a direct causal link between the applicants' underlying conditions and Hunt's perception of the applicants as substantially limited in their ability to work as truck drivers.

To make a further distinction that it ultimately finds insignificant, the majority asserts that "[i]ndividuals suffering from the conditions treated with the 'Heart Condition' or 'Disqualifying Condition' drugs are potentially explicitly barred from truck driving by 49 C.F.R. § 391.41." *Ante* at 76–77 & n. 5 Many of the conditions listed in this regulation only disqualify an individual if the condition is "likely to interfere with his/her ability to control and drive a commercial motor vehicle safely," 49 C.F.R. § 391.41(b)(5), or otherwise suggest that an individualized determination of potential safety concerns is required. *See id.* § 391.41(b)(6)-(12). In relying on these regulations to support Hunt's policy, the majority ignores the crucial difference between individualized determinations of driver safety and Hunt's explicit policy to create a *per se* bar from truck driving with respect to these individuals. Hunt's policy simply assumes, without justification, that these individuals are unfit to drive trucks.

not take [the medication] and drive"); Curtin Decl., Exhs. 23, 25 (reviewer "informed appl[icant] that he could not take the med[ication] on [the] truck"); Curtin Decl., Adair Depo. (representative told applicant "it's illegal to drive a truck with that [medication]"); Curtin Decl., Manning Depo. (representative told applicant "it was illegal for a driver to drive while on this medication"). The EEOC has provided sufficient evidence to create a factual issue whether Hunt perceived the applicants as broadly limited in their ability to work as a truck driver.

The majority explains this evidence by stating:

Although a few evaluators' comments could be more broadly interpreted, there is no evidence that Hunt's reviewers, relying on Hunt's own DRL and drug lists to make a judgment on qualification for a position at Hunt, intended to make an evaluation beyond Hunt's specific guidelines.

*Ante* at 76–77. In reviewing a grant of summary judgment, however, we do not refuse to credit a broad, but reasonable, interpretation of the evidence. *Giordano*, 274 F.3d at 749–50. Even if this were the standard, Hunt's reviewers stated that one applicant would "never drive for anybody," and made similar statements about many other applicants; it is difficult to imagine a clearer statement that the reviewers intended to say that the applicants were, in fact, substantially limited in their ability to work as a truck driver for any company.

The majority asserts that because Hunt's reviewers were not the ultimate decision makers, the comments "simply are not sufficient to indicate that Hunt thought the applicants were more broadly limited." *Ante* at 76–77. Again, this is a matter for the factfinder to decide. Hunt's own employees stated on several occasions that applicants were unfit to drive; a factfinder reasonably could impute these statements to Hunt, even if these employees were not the ultimate decision makers. Hunt proffers no evidence that these unidentified "ultimate hiring authorities" did not share the reviewers' perceptions or rely upon their statements about the applicants' limitations. Indeed, Hunt does not argue otherwise; it simply argues that its employees' statements implicitly refer only to jobs at Hunt. A factfinder is certainly allowed to determine whether the statement that an applicant would "never drive for anybody" implicitly refers only to jobs at Hunt; it is not, however, this Court's job to do so. In reviewing whether summary judgment is appropriate, this Court does not make factual determinations or refuse to credit legitimate inferences based upon the evidence presented, but views the evidence in the light most favorable to the nonmoving party. *See Giordano*, 274 F.3d at 746.

Hunt also argues that the statements of Dr. Cooper should not be imputed to it. The EEOC provides significant evidence that Hunt relied on Dr. Cooper's advice, including, for example, a reviewer's statement that the applicant was "disqualified per Dr. Cooper." This suffices to provide a direct link between Dr. Cooper's opinions regarding applicants and Hunt's view of the applicants as disabled.

Finally, the majority's argument that Hunt's policy should not be imputed to other companies in determining whether the applicants were perceived as disabled is immaterial. Contrary to the majority's assertion, this is not a case in which the *potential* imputation of Hunt's policy to other companies would result in the applicants being regarded as "substantially limited in the major life activity of working *only as a result of this imputation.*" *Sutton*, 527 U.S. at 493, 119 S.Ct. 2139. It is Hunt's *explicit* statement that it believed

applicants to be unfit to drive a truck that supports Hunt's perception of these individuals as substantially limited in their ability to drive a truck; no potential imputation is required. Thus, the EEOC has provided sufficient evidence that a factfinder could reasonably conclude that Hunt regarded the rejected applicants as substantially limited in the major life activity of working, because Hunt regarded them as unfit to be truck drivers.

## CONCLUSION

Because I find ample support in the record for the assertion that Hunt regarded the applicants as d substantially limited in the major life activity of working, and thus, the applicants were disabled within the meaning of the ADA, I respectfully dissent.